# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|   |   |   |
|---|---|---|
| **DUSTON SCHARBROUGH**, *et al.*, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:20-cv-4527** |
| | : | |
| **v.** | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| **SOUTH CENTRAL OHIO JOB AND** | : | **Magistrate Judge Chelsey M. Vascura** |
| **FAMILY SERVICES**, *et al.*, | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on the Defendants' Motion to Dismiss Plaintiff's Complaint (ECF No. 13). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

## I.      BACKGROUND

### A.      Factual Background

This case arises out of the interactions between Plaintiffs Duston and Cyndi Scharbrough and the child protective services apparatus in Ross County, Ohio from 2017 up to the present. The Plaintiffs allege that the South Central Ohio Job and Family Services ("SCOJFS") agency in Ross County, as well as many of its employees, has violated their rights under federal and state law as it pursued investigations concerning their child, L.S. The Plaintiffs also bring claims against the Ross County Sheriff's Office ("RSCO") and an Assistant Prosecuting Attorney for their involvement.

According to Plaintiffs, the troubling conduct began in February 2018. SCOJFS began an investigation into the Plaintiffs after RSCO received a report that Duston was sexually abusing

1

K.S., one of his daughters from a previous relationship. (ECF No. 1 ¶ 48). In August 2017, the couple had been investigated over domestic violence allegations. (*Id.* ¶ 37). Because Cyndi had worked for SCOJFS through January 2017, SCOJFS recused itself from the investigation due to a conflict of interest and the matter was handled by SCOJFS in Vinton County. (*Id.* ¶ 37). In November 2017, the case against them was closed and the allegations were deemed unsubstantiated by SCOJFS-Vinton County.[1] (*Id.* ¶ 41). On February 27, 2018, a caseworker from SCOJFS contacted Duston about a new investigation. (*Id.* ¶ 54). Duston expressed concerns that SCOJFS was now handling an investigation into the couple, given the recent recusal and April's previous employment with the agency. (*Id.* ¶ 54). His concerns were dismissed. (*Id.*).

Despite the couple's opposition, SCOJFS proceeded with its investigation into the Plaintiffs. The Plaintiffs provided SCOJFS employees with evidence of the family history and the children's recent behavioral issues. (*Id.* ¶ 60). They also raised concerns that the children's mother had a history of manipulating the children. (*Id.*). After the other children were removed from custody by an *ex parte* order in May 2018, a SCOJFS caseworker informed Cyndi that neither Assistant Prosecuting Attorney Ater nor the agency had any concerns with L.S. staying in the home because Cyndi had the capacity to protect L.S. (*Id.* ¶ 77). SCOJFS conducts weekly meetings in conjunction with Ms. Ater, at which they discuss all children services cases and make all case decisions. (*Id.* ¶ 58). At least two of the new investigations into Plaintiffs immediately followed these meetings. (*Id.* ¶¶ 153, 175)

After the other children were removed from Duston's custody, SCOJFS's investigation continued. The agency interviewed the other children, but never contacted the Plaintiffs about the ongoing investigation into the domestic violence allegations. (*Id.* ¶¶ 94–96). During the continued

---

[1] Unless otherwise qualified with a geographic designation, all references to "SCOJFS" in this Opinion and Order are referring to SCOJFS in Ross County.

investigation, the SCOJFS Defendants never visited their home, where they remained with L.S., or interviewed the Plaintiffs about the allegations. (*Id.* ¶ 105). As a result, the Defendants had no direct knowledge or credible information about L.S.'s living conditions or circumstances as they engaged in decision-making about how to proceed with her case. (*Id.* ¶ 105). The Plaintiffs also allege that the SCOJFS Defendants had evidence and substantial reasons to believe that the sexual abuse allegations made against Duston were false. (*Id.* ¶ 106). According to Plaintiffs, the SCOJFS Defendants knew of the results of the SCOJFS-Vinton investigation, where the agency had thoroughly investigated and found the same domestic violence allegations to be "unsubstantiated." (*Id.* ¶ 109).

Nonetheless, on September 5, 2018, SCOJFS employees showed up to Plaintiffs' home and removed L.S. by an *ex parte* order. (*Id.* ¶ 99). They were accompanied by two armed RSCO employees. (*Id.* ¶ 102). Defendant Radcliff informed Cyndi that L.S. was being removed for her safety because of the sexual abuse allegations against Duston. (*Id.* ¶ 100). Cyndi offered to enter a voluntary safety plan with SCOJFS instead. (*Id.*). She also offered to leave the home with L.S. and stay with friends or family, or to permit L.S. to stay with friends or family independently. (*Id.*). Defendant Radcliff refused all of these options and refused to consider other suitable placements. (*Id.*). As a result, L.S. was placed in foster care. (*Id.*) Just before the shelter care hearing on September 6, 2018, the Plaintiffs received a copy of the affidavit used to establish probable cause, which they allege contains false and misrepresented statements. (*Id.* ¶ 109). After the hearing, Cyndi informed Defendant Radcliff about additional evidence to be considered. (*Id.* ¶ 111). During this conversation, Radcliff informed Cyndi that the decision to pursue an *ex parte* removal order was the result of a collective. (*Id.* ¶ 104). Radcliff also refused to consider Cyndi's parents as a placement option because they lived out-of-state. (*Id.* ¶ 111).

L.S.'s case continued on. A variety of caseworkers from SCOJFS cycled through the case. The Plaintiffs continued to raise their concerns about the conflict of interest, unconsidered exculpatory evidence, and other deficiencies they saw with the investigation. (*Id.* ¶¶ 114–15, 123). SCOJFS and its agents dismissed their concerns each time. As the case remained open, the Plaintiffs allege that SCOJFS workers began to threaten them. After Cyndi raised complaints again in December 2018 to Defendant Perry, she alleges that Ms. Perry "proceeded to intimidate, threaten, and coerce Cyndi into forfeiting the Plaintiffs' rights to a trial." (*Id.* ¶ 124). Ms. Perry told her that going to trial would result in SCOJFS taking permanent custody of the children. (*Id.*). She offered Cyndi unsupervised weekend visits with L.S. and to begin the Interstate Compact on the Placement of Children ("ICPC") process to place L.S. with Cyndi's parents—if the Plaintiffs stipulated to the dependency. (*Id.*). These promises and inducements were repeated before the adjudication hearing that took place in January 2019. In fear that SCOJFS would retaliate if the Plaintiffs did not accept, the Plaintiffs stipulated to the dependency of the other children. (*Id.* ¶ 126). After the stipulation, Cyndi only received two-hour unsupervised visits and the ICPC process to place L.S. with Cyndi's parents was never initiated. (*Id.* ¶¶ 127, 130–31).

In May 2019, Cyndi was assigned a new caseworker to whom Cyndi again raised her concerns about exculpatory evidence that SCOJFS was not investigating. (*Id.* ¶ 138). Cyndi also informed the caseworker of her changed circumstances: she had leased an apartment and was living separately from Duston. (*Id.* ¶ 139). SCOJFS employees advised Cyndi to file a motion to return so L.S. would be returned to her custody. (*Id.*). They also told her that they would file a letter recommending to the juvenile court that L.S. be returned to Cyndi. (*Id.*). Cyndi filed her motion on May 14, 2019, and a hearing was set for July 23, 2019. (140). In the interim, SCOJFS returned L.S. to Cyndi's physical custody, approved L.S. to travel to Virginia with Cyndi, and approved

L.S. moving to Virginia. (*Id.* ¶ 141). On July 23, 2019, the motion was formally granted and the case on L.S. was closed. (*Id.* ¶ 142).

L.S.'s case would not remain closed, however. In August 2019, Duston was indicted on criminal charges from the sexual abuse allegations. (*Id.* ¶ 144). As part of his pre-trial release, Duston was not to have contact with anyone under the age of 18, including his children; he has complied with this condition. (*Id.*). In September 2019, the Plaintiffs got married and informed their caseworker about the marriage. (*Id.* ¶ 149). After L.S. was returned to Cyndi's custody, Cyndi had continued to maintain multiple residences. (*Id.* ¶ 143). Cyndi maintains that SCOJFS is aware of this fact, but insists that SCOJFS does not know when she stays at the Plaintiffs' shared apartment. (*Id.*). In November 2019, their caseworker questioned the Plaintiffs about L.S., including her whereabouts and school enrollment information. (*Id.* ¶ 151). The Plaintiffs refused to provide information beyond the fact that L.S. did not live with Duston or have any contact with him. (*Id.*). Plaintiffs also informed SCOJFS that L.S. lived outside the jurisdiction of the Juvenile Court and SCOJFS. (*Id.*).

Two days later, SCOJFS employees came to Plaintiffs' shared apartment and informed them that another child services case against Cyndi had been opened on the grounds that L.S. was living with and having contact with Duston. (*Id.* ¶ 153). The Plaintiffs had already denied this allegation and had moved L.S. out of the jurisdiction in summer 2019, with SCOJFS's approval. The Plaintiffs maintained that L.S. did not live with or see Duston, and that she lived outside the jurisdiction of SCOJFS. (*Id.* ¶ 154). The Plaintiffs accused SCOJFS of harassing them by opening investigations against them, with no new allegations or evidence. (*Id.*). A search of the apartment turned up no indication that L.S. had been there. (*Id.* ¶ 155). After the SCOJFS Defendants left the Plaintiffs' apartment, Cyndi found out that they had called her mother in Virginia and sought

information about L.S. (*Id.* ¶ 157). Cyndi's mother did not provide any information. (*Id.*). SCOJFS employees denied calling Cyndi's mother. (*Id.* ¶ 158).

In April 2020, the Plaintiffs found that SCOJFS had opened another sexual abuse investigation into Duston in January 2019. (*Id.* ¶ 161). Duston contacted SCOJFS, who would not tell him the substance of the allegation against him. (*Id.* ¶ 162). He was informed by Defendant Flick that the investigation had been completed and the allegation had been "substantiated." (*Id.*). Duston requested a formal letter about the disposition of this investigation. (*Id.* ¶ 163). Duston never received anything in writing. (*Id.*). He requested an appeal of the disposition, but no one at SCOJFS has contacted him about this request. (*Id.*).

In July 2020, Cyndi was at the Plaintiffs' shared apartment ahead of Duston's scheduled trial because she had been subpoenaed. (*Id.* ¶¶ 173–74). On July 16, 2020, SCOJFS opened yet another children service case against Cyndi. (*Id.* ¶ 175). A new caseworker left a business card and letter for Cyndi, tucked in the door of Plaintiffs' shared apartment, which informed Cyndi that she had an appointment for 3:00 p.m. on July 21, 2020 to speak with him regarding L.S. (*Id.* ¶ 176). The letter warned Cyndi that if she did not attend the appointment, court action could be pursued. (*Id.*). The next day, Cyndi called her new caseworker, who informed her that the investigation had been opened on the grounds that L.S. was living with and having contact with Duston. (*Id.* ¶ 177). Cyndi again refused to provide information about L.S.'s whereabouts, beyond the fact that she was outside of SCOJFS's jurisdiction and has not had any contact with Duston. (*Id.*). Cyndi also informed the caseworker that she refused to meet with him or anyone else from SCOJFS. (*Id.*). When SCOJFS Defendants arrived at the Plaintiffs' shared apartment, Duston was present. (*Id.* ¶ 178). After another search, SCOJFS Defendants found no evidence that L.S. had been in the apartment. (*Id.* ¶ 179).

Throughout this time, the Plaintiffs have also filed formal complaints with SCOJFS, in addition to lodging their oral complaints with SCOJFS and its employees. A few weeks after the removal of his other children, Duston received a disposition letter from SCOJFS finding that the sexual abuse allegations against him had been substantiated. (*Id.* ¶ 80). Duston pursued his appeal rights with SCOJFS to raise his concerns about the conflicts of interest, SCOJFS's investigation, and SCOJFS's continued refusal to conduct a sufficient investigation. (*Id.* ¶¶ 82, 116–17, 119–20). Duston participated in an appeal hearing on October 16, 2018 before five unknown SCOJFS employees, after which he received a letter from SCOJFS that the substantiated determination of sexual abuse would be upheld. (*Id.* ¶ 121). The Plaintiffs submitted formal complaints to SCOJFS in July 2018, May 2019, and July 2020. (*Id.* ¶¶ 87, 132, 180). The Plaintiffs also submitted two complaints to the Ohio Department of Jobs and Family Services, Office of Families and Children ("ODJFS-OFC"). (*Id.* ¶¶ 89, 132). Unlike SCOJFS, ODJFS-OFC found merit to the Plaintiffs' complaints and issued a report finding that it was a conflict of interest for SCOJFS to handle the cases, that the initial risk and safety assessments were insufficient, that it could not be determined what new information was received by SCOJFS to necessitate L.S.'s immediate removal, and that the investigation activities were insufficient and non-compliant. (*Id.* ¶ 148).

## B. Procedural Background

The Plaintiffs filed a complaint in federal court on September 1, 2020, pursuing damages for the removal of L.S. and continued investigations by SCOJFS under the federal Constitution and Ohio law. (ECF No. 1). The Plaintiffs named SCOJFS and RSCO as Defendants and also brought claims against many individual SCOJFS and RSCO employees in their individual capacities. The Plaintiffs sued several supervisory employees at SCOJFS, including Jody Walker, the Director, Melissa Flick, a Protective Services Manager, and Marjorie Evans and Karla Lindsey,

both of whom are Protective Services Supervisors. (*Id.* ¶¶ 9–13). The Plaintiffs also named as Defendants the various caseworkers who were assigned to their case, including Jennifer Snow, Elizabeth Radcliff, Jennifer Mills, a John Doe 1, Tracey Perry, Lindsey Sparks, Breanna Schreck, Theresa Reeves, and Colton Lightle. (*Id.* ¶¶ 14–21). The Plaintiffs also brought claims against Defendants Ryan Speakman and Timothy Sams, who are law enforcement officers with RSCO, as well as Jennifer Ater, an Assistant Prosecuting Attorney. (*Id.* ¶¶ 23–26). The Plaintiffs seek to recover damages for violations of the First, Fourth, and Fourteenth Amendments, as well as several Ohio tort law provisions. In November 2020, the Defendants submitted a collective motion to dismiss the Plaintiffs' complaint. (ECF No. 13). The Plaintiffs filed a response in opposition to the Defendants' motion. (ECF No. 22). The Defendants filed a reply in support of their motion to dismiss (ECF No. 25), at which time the motion became ripe for this Court's review.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for a failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted). In short, the

plaintiff's complaint "must be enough to raise a right to relief above the speculative level."

When interpreting questions of state law, a "federal court must apply state law in accordance with the controlling decisions of the highest court of the state." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Where the "highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue," using "the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Id.* (citing *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir. 1987)). At the same time, a "federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citing *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

The Court must liberally construe a *pro se* plaintiff's pleadings. *Pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *West v. Adecco Emp. Agency*, 124 F. App'x 991, 992 (6th Cir. 2005) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The Supreme Court, however, has "never suggested procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Id.* (quoting *McNeil v. United States*, 508 U.S. 106, 113 (1993)). A *pro se* litigant "must conduct enough investigation to draft pleadings that meet the requirements of the federal rules." *Id.* (quoting *Burnett v. Grattan*, 468 U.S. 42, 50 (1984)).

### III.    LAW & ANALYSIS

The Defendants have moved to dismiss each of the eighteen counts of Plaintiffs' complaint. They argue that this Court cannot maintain jurisdiction over Plaintiffs' Fourth and Fourteenth

Amendment claims because of the *Rooker-Feldman* doctrine. Defendants then argue that various forms of immunity preclude Plaintiffs' claims against the Defendants. Finally, Defendants argue that Plaintiffs have failed to state a claim under Rule 12(b)(6) for several of the claims in the Complaint. This Court will address these arguments in turn.

### A. *Rooker-Feldman* Does Not Bar Jurisdiction

The *Rooker-Feldman* doctrine holds that lower federal courts should not sit in direct review of state court decisions, unless otherwise authorized by Congress to do so, but that they may assert jurisdiction over independent federal claims. *See McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). This doctrine is designed to prevent federal courts from encroaching into the business of state judicial systems. The Supreme Court clarified in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.* that the *Rooker-Feldman* doctrine does not prohibit "a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court," but rather "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." 544 U.S. 280, 284 (2005). The Sixth Circuit has characterized *Rooker-Feldman* as applying only to an "exceedingly narrow set of cases." *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 400 (6th Cir. 2020); *see also Stephens v. Hamilton Cnty. Jobs & Family Servs.*, 46 F. Supp. 3d 754, 758 (S.D. Ohio 2014). Critics of *Rooker-Feldman* have noted that the doctrine has spiraled beyond its original bounds, "interfering with efforts to vindicate federal rights." *VanderKodde*, 951 F.3d at 405 (Sutton, J., concurring). In determining whether *Rooker-Feldman* will bar federal court jurisdiction, district courts must examine whether the source of a plaintiff's claims are state court judgments or another independent source. *See McCormick*, 451 F.3d 382 at 392–93. The

Defendants argue that *Rooker-Feldman* bars this Court from exercising jurisdiction over both Plaintiffs' Fourth and Fourteenth Amendment claims.

## 1.      Fourteenth Amendment Claims

The Defendants contend that *Rooker-Feldman* will bar this Court from exercising jurisdiction over Plaintiffs' procedural and substantive due process claims relating to the removal of their minor child. The Defendants emphasize that the removal of L.S. from the custody of her parents was done pursuant to an *ex parte* court order. (ECF No. 13 at 8). Because the *Rooker-Feldman* doctrine does not allow federal courts to sit in review of state court judgments, the Defendants argue that this court lacks jurisdiction. (*Id.*). The Defendants also note that it was the decision of the state court, not the SCOJFS employees, to remove L.S. from the home. (*Id.* at 9). In response, the Plaintiffs also argue that they are challenging misconduct occurring prior to the initiation of judicial proceedings, after the dismissal of the proceedings, and conduct that was not sanctioned by a court or otherwise related to the ongoing judicial proceedings. (ECF No. 22 at 14). In their reply, the Defendants emphasize that the removal was done pursuant to the Juvenile Court order and thus *Rooker-Feldman* must bar jurisdiction. (ECF No. 25 at 3).

According to the Plaintiffs, the SCOJFS Defendants sought an *ex parte* removal order for L.S. without visiting their home or notifying them about any concerns related to L.S., such that the decision was not based on any knowledge or credible information about the child's circumstances. (ECF No. 1 ¶ 105). Plaintiffs further allege that SCOJFS employees possessed contradictory evidence about sexual abuse allegations related to K.S., yet did not thoroughly investigate the dueling assertions before seeking the *ex parte* removal order for L.S. (*Id.* ¶¶ 106–08). When the Scharbroughs received a copy of the affidavit supporting probable cause, they noticed that it relied on identical allegations that led to an earlier 2017 investigation—allegations that SCOJFS-Vinton

"had thoroughly investigated and unsubstantiated." (*Id.* ¶ 109). The Plaintiffs allege that the SCOJFS Defendants and Ater knew of the previous investigation by SCOJFS-Vinton and the results, but still relied on those allegations in seeking a court order to remove L.S. (*Id.*). Based on these allegations, the Scharbroughs assert procedural and substantive due process claims, alleging violations of the Fourteenth Amendment.

The mere fact that a juvenile court order was issued will not preclude federal court jurisdiction if the claims do not stem from that order. In *Kovacic v. Cuyahoga County Department of Children & Family Services*, 606 F.3d 301 (6th Cir. 2010), the Sixth Circuit held that *Rooker-Feldman* does not bar claims where a plaintiff is not seeking review or reversal of a juvenile court decision but rather where their suit focuses on the conduct of defendants "that led up to" the juvenile court's order. 606 F.3d at 310. Local child service authorities had been investigating the Kovacic family, who had two minor children, during a tense custody dispute. *Id.* at 303–04. When the children's father reported that abuse was escalating and putting the children at "imminent risk" of physical harm, social workers took custody of the children pursuant to a standing order that allowed removal of children "without a warrant or other prior judicial approval in situations where Family Services reasonably believed the children faced 'imminent risk' of harm." *Id.* at 304. Under the order, a county prosecuting attorney ensured that removal met all legal requirements and a "probable cause for removal" hearing was to be held before a juvenile court magistrate within 72 hours of removal. *Id.* at 304–05. After seeking a valid order, social workers, accompanied by police, forcibly entered the home and seized the children. *Id.* at 305. The children spent ten months in foster care following their removal. *Id.* at 305–06.

In reaching its decision in *Kovacic*, the Sixth Circuit looked to a decision by the Seventh Circuit wherein the plaintiff alleged that the people involved in deciding to remove her from the

custody of her parents "violated her constitutional rights, independently of the state court decision." *Id.* (quoting *Brokaw v. Weaver*, 305 F.3d 660, 665 (7th Cir. 2002)). The Sixth Circuit found that *Rooker-Feldman* would not bar jurisdiction over the *Kovacic* plaintiffs' suit, which sought compensatory damage stemming from Family Services' alleged failure to undertake an independent review prior to removal and triggering juvenile court proceedings based on "uncorroborated and unverified information from third parties." *Id.* at 310.

Following *Kovacic*, courts have exercised jurisdiction over cases in which plaintiffs challenge the conduct of government actors, including caseworkers, leading up to a juvenile court decision. *See, e.g.*, *Arsan v. Keller*, 784 F. App'x 900, 906–07 (6th Cir. 2019) (noting that district court resolved defendants' motions for judgment on pleadings stemming from caseworkers' removal of minor children and allowed Fourth Amendment claim to proceed to trial against one caseworker); *Godboldo v. County of Wayne*, 686 F. App'x 335, 342–43 (6th Cir. 2017) (noting future challenges to county's policy of allowing probation officers to authorize child removal orders should not be foreclosed from constitutional review); *Stephens*, 46 F. Supp. at 759 (finding no *Rooker-Feldman* bar where plaintiff challenged case worker's reliance on false information to procure a magistrate's permission to seize children).

The source of the Scharbroughs' injuries, as alleged, are not the order itself but the conduct leading up to the issuance of the order. They do not challenge the court that issued the *ex parte* removal order. Rather, their Fourteenth Amendment challenges stem from conduct by other government officials that led to the issuance of this order. Plaintiffs allege that the Defendants removed L.S. from their custody by seeking an *ex parte* order without any knowledge or credible information concerning L.S.'s welfare. The Defendants did not speak to the Plaintiffs about any concerns, nor did they ever visit the residence prior to seeking a court order to investigate whether

L.S. was safe. The Plaintiffs further allege that the Defendants actually possessed evidence that contradicted the allegations L.S.'s removal was premised on, yet did not attempt to reconcile the conflicting information. According to Plaintiffs, the SCOJFS Defendants were also aware that these accusations had been investigated and unsubstantiated by a SCOJFS entity in another county.

Through their Fourteenth Amendment claims, the Plaintiffs aim to challenge the Defendants' decision to proceed with seeking a court order to remove L.S., without sufficient investigation and without probable cause. The source of the Scharbroughs' injuries is not the court order then but the prelude to it. Indeed, it is unlikely the Juvenile Court would have issued the *ex parte* order of removal if the Defendants had not sought it, despite an alleged lack of credible information. Accordingly, *Rooker-Feldman* does not apply as to their Fourteenth Amendment claims relating to the actions culminating in the *ex parte* order.

### 2.     Fourth Amendment Claims

It is settled law that social workers must comply with the Fourth Amendment. In *Kovacic*, the Sixth Circuit found that the Fourth Amendment warrant requirement, as well as its exceptions, apply to the removal of children from their homes by social workers. 724 F.3d at 699. The Sixth Circuit has also explained that the removal of a child from her custodial parents' home is considered a seizure under the Fourth Amendment, which will only be constitutionally reasonable if done pursuant to a court order, supported by probable cause, or is otherwise justified by exigent circumstances. *See Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 453 n.5 (6th Cir. 2006). The mere issuance of a court order, however, does not instantly trigger *Rooker-Feldman*. The Sixth Circuit has noted that *Rooker-Feldman* applies "only when a state court renders a *judgment*—when the court 'investigates, declares, and enforces liabilities' based on application of law to fact." *VanderKodde*, 951 F.3d at 402 (quoting *Van Hoven v. Buckles & Buckles, P.L.C.*,

947 F.3d 889, 892 (6th Cir. 2020)). The Sixth Circuit has also reiterated that *Rooker-Feldman* does not apply where a plaintiff's injuries stem from a defendant's conduct, such as when a plaintiff challenged a defendant who filed a false affidavit in a court proceeding, rather than a court order. *See id.* at 403 (discussing *Todd v. Weltman, Weinberg & Reis Co.*, 434 F.3d 432, 437 (6th Cir. 2006)). Where plaintiffs have challenged the conduct of defendants that had ultimately led to the issuance of a court order, such as when debt collectors unlawfully utilized state court proceedings to collect amounts they were not entitled to collect, *Rooker-Feldman* did not bar federal court jurisdiction. *See VanderKodde*, 951 F.3d at 403.

The Defendants invoke *Rooker-Feldman* because a court order was issued for the removal of L.S. The Defendants argue that since the entry into Plaintiffs' home and the removal of L.S. was done pursuant to an *ex parte* order of the Juvenile Court, any claims arising from that entry is "in fact a challenge to the judgment itself" and this Court is barred from maintaining jurisdiction. (ECF No. 13 at 8 (quoting *McCormick*, 451 F.3d at 394)). In response, the Plaintiffs argue that they are challenging the Defendants' actions, not the *ex parte* removal order issued by the Juvenile Court. (ECF No. 22 at 13). Specifically, the Plaintiffs allege that Defendants entered their home and removed their minor child without a signed court order or warrant, in the absence of exigent circumstances. (*Id.*). In their reply, the Defendants emphasize that the Plaintiffs' claims stem from L.S.'s removal, which was done pursuant to a court order and so *Rooker-Feldman* must bar review. (ECF No. 25 at 2).[2] Defendants also dispute the relevance of the cases relied upon by Plaintiffs, arguing that they are factually distinguishable from the facts alleged here. (*Id.* at 2–3). Finally, the

---

[2] The Defendants note that the Scharbroughs' allegations that the removal was executed only with verbal authorization was not pled in their Complaint, and, even if it had been, Ohio law contemplates verbal authorization for an *ex parte* order. (ECF No. 13 at 1–2). This Court will not consider the Scharbroughs' allegation, raised for the first time in response to the Motion to Dismiss, as it was not asserted in the Complaint.

Defendants note that the claimed injuries—unexpected legal costs and expenses—and the request for injunctive relief both support their argument that Plaintiffs are "effectively" challenging the state court's underlying findings as to L.S. (*Id.* at 3).

In their Complaint, the Scharbroughs allege that employees from SCOJFS and RSCO arrived at their home on September 5, 2018 and removed L.S., without presenting a warrant or any other court documents. (ECF No. 1 ¶¶ 99–101). They further allege that there were no exigent circumstances or immediate danger of harm at the time L.S. was removed. (*Id.*). Based on these allegations, the Scharbroughs asserted claims of warrantless entry and unlawful seizure in violation of the Fourth Amendment. In turn, the Defendants have filed a certified copy of the Juvenile Court's order granting temporary custody of L.S. to SCOJFS on September 5, 2018. (ECF No. 15-1).[3] This order was issued under O.R.C. § 2151.33, which permits the juvenile court to make "any temporary disposition of any child that it considers necessary to protect the best interest of the child." This section also permits the granting of an *ex parte* order when a juvenile court finds that the best interest and welfare of the child require immediate issuance of an order. *See* O.R.C. § 2151.33. The order was signed by the Juvenile Court judge and instructs that the order "shall be executed by Law Enforcement having jurisdiction over the residence where children are located." (ECF No. 15-1).

As emphasized by the Sixth Circuit, *Rooker-Feldman* will act as a jurisdictional bar in an exceedingly narrow set of cases. *See VanderKodde*, 951 F.3d at 400. The Sixth Circuit has found

---

[3] While this Court's primary focus in assessing a Rule 12(b)(6) motion will be the allegations in the complaint, this Court may consider exhibits attached to a Rule 12(b)(6) motion "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The court order attached as by Defendants as Exhibit A is central to the Plaintiffs' allegations concerning the entry and removal and so this court may consider it without converting the Defendants' motion into a motion for partial summary judgment.

that *Rooker-Feldman* barred a parent suing a juvenile court judge over the child removal order entered against him. *See Brent v. Wayne County Department of Human Services*, 901 F.3d 656, 674–75 (6th Cir. 2018); *see also Cunningham v. Dep't of Children's Servs.*, 2021 WL 118413, at *3 (6th Cir. Jan. 13, 2021) (finding that *Rooker-Feldman* barred suit against judge who issued *ex parte* order). The Plaintiffs have not filed suit against the judge who issued the order, but against the SCOJFS Defendants whose conduct led up to the issuance of that order. The Plaintiffs also allege that some Defendants knowingly filed a false affidavit of probable cause in violation of the Fourth Amendment and pursued the *ex parte* order without sufficient justification that L.S.'s safety was in jeopardy. They also challenge the execution of the *ex parte* order by SCOJFS and RSCO Defendants.

*Rooker-Feldman* narrowly bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. *Rooker-Feldman* does not apply "to federal lawsuits presenting similar issues to those decided in a state court case or even to cases that present exactly the same, and thus the most inextricably intertwined, issues." *See VanderKodde*, 951 F.3d at 406 (Sutton, J., concurring) (citing *Exxon Mobil*, 544 U.S. at 293). The Sixth Circuit recently held in a child protective services case that *Rooker-Feldman* did not deprive court of jurisdiction over claims against defendants "based on their conduct leading up to the issuance of the *ex parte* order and executing that order." *Cunningham*, 2021 WL 118413, at *4. This Court is thus not deprived of jurisdiction over Plaintiffs' claims by operation of the *Rooker-Feldman* doctrine.

**B.     Defendants' Immunity from Suit**

The Defendants assert that several doctrines shield them from liability from suit. They invoke four categories of immunity: absolute immunity, absolute quasi-judicial immunity, qualified immunity, and statutory immunity. Each of these doctrines will operate to shield a state actor from civil liability for actions taken when she is performing the functions of her office, but the doctrines differ in scope. Absolute immunity completely bars an official from civil suits; typically, judges and prosecutors enjoy the benefits of absolute immunity when acting in their judicial or prosecutorial capacities. *See, e.g.*, *See Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000). This doctrine will bar suit even if the actions at issue would otherwise be unconstitutional: it is *absolute*, so long as the individual is performing judicial or prosecutorial functions of her judicial or prosecutorial office. Such immunity is bestowed on these individuals to ensure they carry out the duties of their office vigorously, without fear of lawsuits. *See Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). Absolute quasi-judicial immunity has also been recognized for individuals who are not judicial officers themselves, but who act as legal advocates by initiating court actions or making recommendations to a court, or who carry out the missives of the court. *Id.* By contrast, qualified immunity will also shield government officials from suit, but only insofar "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Finally, there is statutory immunity, in which some states confer immunity from suit on public officials by statute. Statutory immunity can be either absolute or qualified.

The Defendants first claim that absolute immunity requires the dismissal of many of Plaintiffs' claims. Specifically, they argue that absolute quasi-judicial immunity bars Plaintiffs' claims against the SCOJFS and RSCO Defendants under the First, Fourth, and Fourteenth

Amendments. They also argue that common law absolute immunity shields these same Defendants from all of Plaintiffs' state law claims. As to Defendant Ater, she asserts that she is entitled to absolute prosecutorial immunity for all claims against her. Second, the Defendants claim that they are entitled to qualified immunity for all claims related to the entry of the home and seizure of L.S. Third, the municipal defendants, SCOJFS and RSCO, assert that they are entitled to statutory immunity under Ohio law as to Plaintiffs' state law claims, as do the individual Defendants. This Court will address each type of claimed immunity in turn.

## 1.      Absolute Immunity

Absolute immunity fully shields an official from a § 1983 damages suit when properly invoked. This doctrine wholly shields judges, prosecutors, and other officials from civil suits on claims arising out of their performance of their official functions. *See Holloway*, 220 F.3d at 774. The Sixth Circuit has noted that officials seeking the "ironclad protection" of absolute immunity bear the burden of showing that qualified immunity is insufficient. *Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir. 2020) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). As a result, absolute immunity is to be granted only "sparing[ly]." *Id.* (quoting *Buckley*, 509 U.S. at 269). At this stage of litigation, this Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Bright v. Gallia Cnty.*, 753 F.3d 639, 648 (6th Cir. 2014) (quoting *Barnes v. Winchell*, 105 F.3d 1111, 1114 (6th Cir. 1997)). With this guidance in mind, this Court will now assess the Defendants' arguments pertaining to absolute immunity.

### a.    SCOJFS Defendants & Absolute Immunity

The SCOJFS Defendants assert that they are absolutely immune from suit by virtue of their roles as caseworkers. Sixth Circuit jurisprudence extends absolute immunity to social workers in limited circumstances where their conduct is "intimately associated with the judicial phase of the criminal process." *Pittman v. Cuyahoga Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). In *Maternal Grandmother v. Hamilton County Department of Job and Family Services*, 154 N.E.3d 225 (Ohio Ct. App. 2020), the Court of Appeals of Ohio adopted the Sixth Circuit's reasoning in *Pittman* and extended absolute immunity to caseworkers involved in legal proceedings.[4]

### i.    Federal Constitutional Claims

The SCOJFS Defendants claim absolute immunity to Plaintiffs' federal constitutional claims. Absolute immunity is only available, however, when caseworkers are acting in their capacity as legal advocates, such as when initiating court actions, making recommendations to a court, or otherwise testifying under oath. *Holloway*, 220 F.3d at 774. Like prosecutors, caseworkers are not entitled to absolute immunity when they are performing administrative, investigative, or other functions. *Id.* at 775. The Sixth Circuit has held, "no matter how undesirable the results," that caseworkers may receive absolute immunity even when they make intentional misrepresentations to the court or in an affidavit. *Pittman*, 640 F.3d at 725–26. Caseworkers will not be shielded by absolute immunity for conduct unrelated to their roles as advocates before the juvenile court, which could include misrepresentations while participating in agency decisions, improperly investigating potential caregivers, and making misrepresentations to interested parties in dependency proceedings. *Pittman*, 640 F.3d at 726.

---

[4] The decision of the Court of Appeals of Ohio has been accepted by the Supreme Court of Ohio for review. *See* 150 N.E.3d 966 (Ohio 2020). Oral argument is set for April 28, 2021.

The SCOJFS Defendants have asserted absolute immunity for Plaintiffs' claims under the First, Fourth, and Fourteenth Amendments. The SCOJFS Defendants argue that they are entitled to absolute immunity for their participation in the juvenile court proceeding, including against Plaintiffs' claims that they misrepresented facts in affidavits and failed to investigate fully the allegations contained in those affidavits. (ECF No. 13 at 10). The Defendants rely on *Pittman* to support their claims of absolute immunity. (*Id.*). In turn, the Plaintiffs argue that the SCOJFS Defendants were not performing advocacy functions but rather acted in administrative and investigative capacities. (ECF No. 22 at 15). In reply, the Defendants emphasize the Sixth Circuit's analysis and holding in *Pittman*, which granted absolute immunity to caseworkers who filed an affidavit supporting a juvenile abuse petition. (ECF No. 25 at 4).

In their Complaint, the Scharbroughs have pled numerous allegations related to the SCOJFS employees' conduct that is wholly removed from the courtroom. The Scharbroughs allege that the SCOJFS employees possessed exculpatory leads as to the sexual abuse and domestic violence allegations, but refused to investigate them. (ECF No. 1 ¶¶ 59–60, 138). After allowing L.S. to continue to reside with the Plaintiffs after the removal of the other children on the grounds that she was safe, the SCOJFS employees then opened new cases on information that they already possessed when they allowed L.S. to remain. (*Id.* ¶ 77). The Plaintiffs allege that the SCOJFS Defendants never visited their home or interviewed the Plaintiffs when making decisions about L.S.'s case. (*Id.* ¶ 105). As a result, the Defendants had no knowledge or credible information about L.S.'s living conditions or circumstances as they engaged in decision-making about how to proceed with the investigation. (*Id.*).

When SCOJFS employees helped execute the *ex parte* removal of L.S., they denied Cyndi's attempts to enter a voluntary safety plan or to place L.S. with friends or family, away from

Duston. (*Id.* ¶ 100). Instead, L.S. was placed in foster care. As L.S. remained in the system, the Plaintiffs contend that the SCOJFS Defendants continued to intimidate, threaten, and coerce them into stipulating to a dependency for the other children, rather than proceed to a trial. (*Id.* ¶ 124). Defendant Perry also used L.S. as an inducement to enter the stipulation, promising Cyndi unsupervised weekend visits and an initiation of the process to place L.S. out-of-state with her grandparents. (*Id.*). In fear that SCOJFS would retaliate if the Plaintiffs did not accept, the Plaintiffs stipulated to the dependency of the other children. (*Id.* ¶ 126). After the stipulation, Cyndi only received two-hour unsupervised visits and the ICPC process to place L.S. with Cyndi's parents was never initiated. (*Id.* ¶¶ 127, 130–31).

Once Cyndi informed the Defendants that she was residing separately from Duston, the Defendants allowed L.S. to be returned to her custody without a court order. (*Id.* ¶ 139). The Defendants also promised her that they would file a letter supporting a motion to return that Cyndi later filed with the juvenile court. (*Id.*). The Defendants also allowed Cyndi to take L.S. out-of-state, both for a visit and to reside permanently. (*Id.* ¶ 141). After L.S.'s case was closed, the Defendants then opened new cases against Cyndi on the grounds that L.S. was residing in the shared apartment and seeing Duston, despite a lack of evidence to support this allegation. (*Id.*). Plaintiffs repeatedly told SCOJFS employees that L.S. did not see Duston and actually resided outside of SCOJFS's jurisdiction. (*Id.* ¶ 151). Nonetheless, SCOJFS continued to open cases against Cyndi. (*Id.* ¶¶ 151, 175) Multiple searches of the apartment for signs of L.S. by the SCOJFS Defendants have turned up no evidence. (*Id.* ¶¶ 154, 179)

Throughout this time, the Plaintiffs also submitted numerous complaints about the conflicts of interest and deficient investigative techniques, all of which SCOJFS found lacked merit. (*Id.* ¶¶ 87–90, 114–15, 132–33, 180). The Plaintiffs had forwarded their complaints to the state agency,

ODFJS-OFC, whose investigation of Plaintiffs' complaints reached a different outcome. ODJFS-OFC found that the Plaintiffs' complaints did have merit. (*Id.* ¶ 147). ODJFS-OFC found that it was a conflict of interest for SCOJFS to handle the Plaintiffs' cases. (*Id.*). ODJFS-OFC also found deficiencies with the investigations, including insufficient initial assessments of risk and safety, the removal of L.S. without any new information, and general non-compliance in SCOJFS's investigatory activities. (*Id.* ¶ 148).

Opening a case as an investigation within SCOJFS is very different than initiating a case in juvenile court. One of these activities—the initiation of a juvenile court case—would entitle the SCOJFS Defendants involved to absolute immunity because they are acting in their role as legal advocates. Opening internal SCOJFS investigations against Plaintiffs on insufficient or false information, however, falls into the category of investigatory functions. When individuals perform such functions, they are entitled to qualified immunity, at best. *Holloway*, 220 F.3d at 775. Even if investigation results in a court proceeding, it will not automatically be retroactively shielded by that proceeding. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993) ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, . . . that work may be retrospectively described as 'preparation' for a possible trial[.]"). Similarly, the Defendants' decision to pursue the investigation at all, despite the conflicts of interest, and in allegedly deficient ways, also falls beyond the scope of legal advocacy. The Defendants' continued opening of cases against the Plaintiffs, after receiving numerous complaints about the investigations and the conflicts of interest, fall into the categories of investigative or administrative functions. The Plaintiffs have sufficiently pled allegations that show the SCOJFS Defendants were not acting in their role as legal advocates when engaging in the conduct that give rise to Plaintiffs' First and Fourteenth Amendment claims.

Additionally, caseworkers are not entitled to absolute immunity when executing a court order because they are "acting in a police capacity rather than as legal advocates." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 685 (6th Cir. 2018) (quoting *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 694 (6th Cir. 2014)). Law enforcement officials executing facially valid court orders will be extended absolute quasi-judicial immunity *only if* those officials did not obtain an order or warrant despite a lack of probable cause. *See Troyer v. Hershberger*, No. 5:11cv2536, 2012 WL 488251, at *7 (N.D. Ohio Feb. 14, 2012) (citing *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994)). Only qualified immunity is available if an official causes an individual to be unconstitutionally arrested despite obtaining a facially valid warrant. *See, e.g.*, *Griesinger v. Loveland City Sch. Dist.*, No. 1:06cv569, 2008 WL 11451528, at *2 (S.D. Ohio Mar. 13, 2008) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Here, the Plaintiffs allege that the SCOJFS Defendants procured a facially valid court order on insufficient information and relying on known false information. The decision to execute the *ex parte* removal order and to remove L.S. from her home, over Cyndi's attempts to enter a voluntary safety plan or place L.S. with family or friends, cannot be shielded by absolute immunity. Thus, the Plaintiffs have raised sufficient allegations to show that absolute immunity is not available to the SCOJFS Defendants as to the Plaintiffs' Fourth Amendment claims.

To the extent the Plaintiffs challenge the false allegations in the affidavit to support probable cause as to L.S.'s *ex parte* removal, the Defendants are entitled to absolute immunity because submitting an affidavit, even one with falsehoods, is shielded by absolute immunity. As to the other federal claims, the SCOJFS Defendants have not carried their burden of demonstrating that their conduct warrants the sparing grant of absolute immunity. Defendants' motion to dismiss

**COUNTS V, VI, VIII,** and **IX** on absolute immunity grounds are **DENIED**, while the motion to dismiss **COUNT X** is **GRANTED**.

### ii.    State Law Claims

The Supreme Court of Ohio has yet to determine the parameters of immunity for caseworkers and has not addressed the availability of quasi-judicial immunity for these actors. *See State ex rel. Denton v. Bedinghaus*, 784 N.E.2d 99, 106 n.1 (Ohio 2003). When a state's highest court has not directly addressed an issue of substantive state law, a federal district court must predict how the state's highest court would resolve the matter. *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008). Given that Ohio's jurisprudence for prosecutorial immunity follows the Sixth Circuit approach, and the Sixth Circuit's decision in *Pittman* is an extension of its prosecutorial immunity doctrine, this Court will employ the functional approach to the caseworkers' claims for absolute common law immunity.[5]

The intermediate appellate courts in Ohio have issued several relevant decisions on absolute quasi-judicial immunity. Like federal absolute immunity, the burden remains on the public official to establish her entitlement to an immunity defense. The Ohio Court of Appeals has denied absolute immunity where the factual record was not sufficiently developed to determine the precise scope of any potential immunity. *See Gallagher v. Hope*, No. CA-757, 1992 WL 161776, at *1–2 (Ohio Ct. App. June 25, 1992) (citing *Henrisken v. Bentley*, 644 F.2d 825, 854 (10th Cir. 1981)).  In *Maternal Grandmother v. Hamilton County Department of Job and Family Services*, 154 N.E.3d 225 (Ohio Ct. App. 2020), the Ohio Court of Appeals followed the Sixth Circuit's rationale in *Pittman* to extend absolute immunity to caseworkers when they are involved

---

[5] As stated earlier, a decision involving social worker common law immunity is pending before the Supreme Court of Ohio. The Defendants may renew their claims for absolute immunity on remaining state tort law claims if the Supreme Court of Ohio announces a more capacious standard for social workers than the immunity it already offers to prosecutors.

in legal proceedings. The Ohio Court of Appeals has also extended absolute immunity to probation officers preparing presentencing reports as to hold otherwise "would impede judicial functions," but has declined to reach the issue of whether probation officers were entitled to absolute quasi-judicial immunity for actions within the scope of their employment because Ohio has extended statutory immunity to state and municipal employees. *Compare Clark v. Eskridge*, 602 N.E.2d 1228, 1231 (Ohio Ct. App. 1991) (providing absolute immunity), *with McKinney v. Hartley*, No. 2007CA-00072, 2009 WL 154558, at *3 (Ohio Ct. App. Jan. 20, 2009) (declining to expand common law immunities given availability of statutory immunity).

The Plaintiffs have raised several state tort law claims against the Defendants. First, the Plaintiffs accuse the SCOJFS Defendants of interfering with their parental interests by facilitating the *ex parte* removal of L.S. (ECF No. 1 at 50). Second, the Plaintiffs also seek damages against the SCOJFS Defendants for intentional infliction of emotional distress, premised on the facilitation of the seizure of L.S. and continued harassment via subsequent investigations related to L.S. (*Id.* at 51–52). Third, the Plaintiffs also claim a loss of consortium regarding L.S. (*Id.* at 52). Fourth, the Plaintiffs accuse the SCOJFS Defendants of acting with reckless disregard to the Plaintiffs' rights as to their conduct resulting in the seizure of L.S. (*Id.* at 53–54). Finally, the Plaintiffs accuse the SCOJFS Defendants of conspiring to interfere with the Plaintiffs' statutory and constitutional rights and interfere with their custody over L.S. (*Id.* at 54). The SCOJFS Defendants assert common law absolute quasi-judicial immunity as a defense to all of these claims.

The earlier discussion of the SCOJFS Defendants' entitlement to absolute immunity is relevant to their claims of state common law immunity. Again, the Plaintiffs have raised abundant examples of allegations which, if accepted as true, demonstrate that the SCOJFS Defendants were engaging in investigative and administrative work that is not shielded by absolute immunity. The

Defendants' state law tort claims arise from the same allegations as their federal constitutional claims and are based on the improper investigations, conflicts of interest, and SCOJFS Defendants' treatment of the Plaintiffs while L.S.'s case file was open with the agency. In their claims, the Plaintiffs take aim at the ways in which the SCOJFS Defendants' actions helped to facilitate the *ex parte* removal of L.S. and subsequent investigations. Once again, to the extent that any of these state tort law claims are supported in part by the SCOJFS Defendants' conduct as legal advocates, such as filing affidavits or participating in juvenile court proceedings, this conduct is shielded by absolute immunity. While initiating a juvenile court case is shielded by absolute immunity, misconduct during the investigation phase by caseworkers is not. Additionally, caseworkers are not entitled to absolute immunity when executing a court order because they are "acting in a police capacity rather than as legal advocates." *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 685 (6th Cir. 2018) (quoting *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2014)). Because the Plaintiffs state tort law claims are premised to some extent on the SCOJFS Defendants' investigatory and out-of-court conduct toward the Defendants, the SCOJFS Defendants cannot establish an entitlement to absolute quasi-judicial immunity against these claims. Accordingly, the SCOJFS Defendants' motions to dismiss is **DENIED** as to **COUNTS XII, XCIII, XIV, XV, XVI, XVII,** and **XVIII.**

### b. RSCO Defendants & Absolute Immunity

The two RSCO Defendants also claim absolute immunity from Plaintiffs' claims under a theory of quasi-judicial immunity. They also seek absolute immunity on federal common law and state common law grounds.

### i.    Federal Constitutional Claims

The RSCO Defendants argue that they are entitled to quasi-judicial immunity for their execution of the *ex parte* removal order of L.S. The Plaintiffs brought procedural and substantive due process claims against Defendants Speakman and Sams related to the *ex parte* removal of L.S. from the home. (ECF No. 1 at 7, 47–48). Plaintiffs allege that the RSCO Defendants came to their home on September 5, 2018 to remove L.S., but no warrant or court documents were presented to Cyndi at the time. (*Id.* ¶¶ 99–101). The Plaintiffs also allege that the armed RSCO Defendants escorted Cyndi into the house and remained present until the SCOJFS employees left with L.S. (*Id.* ¶ 103). The September 5, 2018 order authorizing the removal of L.S. from her parents' home instructs that the order "shall be executed by Law Enforcement having jurisdiction over the residence" where L.S. was located. (ECF No. 15-1). In response to the RSCO Defendants' motion to dismiss, the Plaintiffs reiterate their allegations that Defendants Speakman and Sam were operating without a signed court order. (ECF No. 22 at 16).

Absolute quasi-judicial immunity has been extended to non-judicial officers who are "performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). The Sixth Circuit has held that enforcing or executing a court order is "intrinsically associated with a judicial proceeding." *Id.* A law enforcement official executing a facially valid court order will be protected by absolute quasi-judicial immunity, as an extension of the absolute immunity of the judicial officer who issued the order. *See Troyer*, 2012 WL 488251, at *7 (citing *Bush*, 38 F.3d at 847). If a law enforcement officer causes an individual to be unconstitutionally arrested by obtaining an order or warrant without establishing probable cause, he may only seek to assert qualified immunity. *See, e.g.*, *Griesinger*, 2008 WL 11451528, at *2 (citing *Malley*, 475

U.S. at 341). The only allegations against the RSCO Defendants relate to their role in executing the court-ordered removal of L.S. from her home. The Plaintiffs do not allege that the RSCO Defendants took part in seeking the court order they knew to not be supported by probable cause, as the SCOJFS Defendants did. As such, they are entitled to quasi-judicial immunity as they were acting to execute a facially valid court order. Accordingly, the RSCO Defendants' motion to dismiss **COUNT VII** and **COUNT IX** is **GRANTED**. These counts are dismissed as to Defendants Speakman and Sams.

### ii.     State Tort Law Claims

The RSCO Defendants also claim common law absolute quasi-judicial immunity as a defense to the state tort law claims against them. The RSCO Defendants have not, however, cited to any authority entitling them to absolute quasi-judicial immunity under common law or set forth the analysis this Court should apply to make such a determination. The Supreme Court of Ohio has extended absolute common law immunity to prosecutors as quasi-judicial officers "when their activities are 'intimately associated with the judicial phase of the criminal process.'" *Willitzer v. McCloud*, 453 N.E.2d 693, 695 (Ohio 1983). Neither the Supreme Court of Ohio nor the Court of Appeals have extended this doctrine to law enforcement.

Several of the districts of the Court of Appeals of Ohio have found that probation officers, as officers of the court, are entitled to absolute immunity when acting within the scope of their employment. *See McCormick v. Carroll*, No. 83770, 2004 WL 2537051, at ¶ 20 (Ohio Ct. App. Nov. 10, 2004); *Clover v. Joliff*, No. 2001–T–0135, 2002 WL 31160089, at ¶ 19 (Ohio Ct. App. Sept. 27, 2002); *but see McKinney v. Hartley*, No. 2007CA-00072, 2009 WL 154558, at ¶ 19 (Ohio Ct. App. Jan. 20, 2009) (declining to reach whether probation officers are entitled to absolute immunity because of availability of statutory immunity). *Clark v. Eskridge*, the initial Ohio case

to extend absolute judicial immunity to probation officers, only considered absolute immunity from a federal claim under § 1983 and relied on interpretations of federal law. *See* 602 N.E.2d 1228, 1230 (Ohio Ct. App. 1991)

Police officers and sheriffs are not officers of the court in the same way that probation officers are, however, so it is unclear what value these precedents have, if any. Additionally, law enforcement officers' immunity from suit in Ohio state decisions turns on the availability of statutory immunity, rather than absolute quasi-judicial immunity. *See Barstow v. Waller*, No. 04CA5, 2004 WL 2427396, at ¶¶ 32–33 (Ohio Ct. App. Oct. 26, 2004). As such, the RSCO Defendants have failed to establish that they are entitled to absolute common law immunity and their motion to dismiss **COUNTS XII, XIII, XIV, XVI,** and **XVII** on these grounds is **DENIED**.

### c.     Prosecutorial Immunity

Defendant Ater asserts absolute prosecutorial immunity as a defense to Plaintiffs' claims against her under both federal and state law. Prosecutors are entitled to absolute immunity from § 1983 suits for individual damages when they are acting within the scope of their prosecutorial duties. *See Imbler v. Pachtman*, 424 U.S. 409, 420 (1976). Ohio law also offers prosecutorial immunity, which mirrors immunity under the federal rules and is subject to the same restrictions. *See Willitzer v. McCloud*, 453 N.E.2d 693, 596 (Ohio 1983).

### i.     Federal Constitutional Claims

Defendant Ater seeks to shield herself from Plaintiffs' First Amendment retaliation and Fourteenth Amendment procedural and substantive due process claims under the doctrine of prosecutorial immunity. In determining whether an official will be protected by prosecutorial immunity, the Sixth Circuit employs a "functional approach," which looks to the "nature of the function performed, not the identity of the actor who performed it." *Cooper v. Parrish*, 203 F.3d

937, 944 (6th Cir. 2000). A court must look at the conduct in question and inquire whether it was "undertaken in connection with one's duties in functioning as a prosecutor." *Red Zone 12 LLC v. City of Columbus*, 758 F. App'x 508, 513 (6th Cir. 2019) (quoting *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006)). Individuals will be shielded by absolute immunity for performing acts that are "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. When the individual is performing functions that are more removed from the judicial process, such as "investigative" or "administrative" functions, she is not entitled to absolute immunity. *See Burns v. Reed*, 500 U.S. 478 (1991). The Sixth Circuit has declined to adopt a bright-line rule concerning the existence of probable cause that would automatically transform a prosecutor's work from the realm of investigation to advocacy. *Watkins v. Healy*, 986 F.3d 648, 664 (6th Cir. 2021). Accordingly, a prosecutor may still perform investigative functions that are not shielded by absolute immunity even after probable cause arises.

Defendant Ater argues that she is entitled to absolute immunity from Plaintiffs' federal constitutional claims because the acts complained of were performed while she was serving as a legal advocate in a judicial proceeding. She contends that she was acting as a legal advocate both in initiating and participating in the dependency proceedings related to L.S. (ECF No. 13 at 12). The Plaintiffs counter that they are seeking damages for Ms. Ater's actions performed in administrative and investigative capacities, which occurred prior to the initiation of judicial proceedings. (ECF No. 22 at 16). They argue that, prior to the initiation of the dependency proceeding, Ms. Ater was giving advice to the other Defendants—an act which typically deprives prosecutors of absolute immunity. (*Id.* at 17). The Plaintiffs also contend that Ms. Ater retaliated against them for "seeking redress of their grievances, asserting their rights, and for their marriage decision." (*Id.*). For these reasons, the Plaintiffs assert that absolute prosecutorial immunity is

unavailable. In their reply, the Defendants argue that the only allegations in the Complaint specific to Ms. Ater involve the initiation of or participation in dependency proceedings, which would entitle her to absolute immunity. (ECF No. 25 at 5).

According to Plaintiffs, Ater engaged in misconduct prior to the initiation of the *ex parte* proceeding. She met with the SCOJFS Defendants every Thursday at 1:00 p.m. to "discuss and make case decisions on all children services cases handled by SCOJFS in Ross County." (ECF No. 1 ¶ 58). At one of these meetings, Ater was part of a collective decision to seek *ex parte* removal of L.S. (*Id.* ¶ 104). The Plaintiffs contend that Ater participated in this decision, despite having no knowledge or credible information of the circumstances surrounding L.S. (*Id.* ¶ 105). Ater also allegedly possessed evidence and substantial reasons to believe the sexual abuse allegations against Duston were false. (*Id.* ¶ 106). Ater was aware of the SCOJFS-Vinton investigation into domestic violence allegations and SCOJFS-Vinton's decision to unsubstantiate those allegations. (*Id.* ¶ 109).

The Plaintiffs also allege that misconduct by Ater continued after the initiation of the court proceedings. Ater pressured the Plaintiffs to stipulate to a dependency by offering to drop the sexual abuse allegation and give Cyndi unsupervised weekend visits with L.S. before a January 2019 adjudication hearing for L.S. (*Id.* ¶ 126). The Plaintiffs allege that Ater "made statements of a threatening, intimidating, and retaliatory nature" during a November 5, 2019 juvenile court hearing after the Plaintiffs got married in September 2019. (*Id.* ¶ 150). Beyond this hearing, the Plaintiffs allege that Ater continued to threaten Cyndi with removal of L.S. from her custody and/or opening juvenile court cases against her. (*Id.*). Ater also demanded that L.S.'s whereabouts be investigated. (*Id.*). She continued to participate in weekly meetings with the SCOJFS Defendants, including one in July 2020 that immediately preceded the initiation of another children services

case against Cyndi. (*Id.* ¶ 175). Ater continued to harass the Plaintiffs by threatening to take custody of L.S. and opening cases against Cyndi on false information. (*Id.*). The Scharbroughs contend that these actions violated their constitutional rights under the First and the Fourteenth Amendments.

At this stage, granting absolute immunity to Defendant Ater as to Plaintiffs' Fourteenth Amendment claims would be inappropriate. As pled, Plaintiffs claim Ater violated their Fourteenth Amendment rights by participating in the investigation and actively working with SCOJFS, rather than merely initiating juvenile court proceedings and acting as a legal advocate. The Plaintiffs raise sufficient allegations that Defendant Ater was not performing a prosecutorial function, but rather an investigatory function. Per the Plaintiffs' allegations, Ater was a key part of the decision-making process as to how SCOJFS would manage L.S.'s case, beyond simply pursuing legal action. The mere fact that an investigation may culminate in a court proceeding will not place all investigatory conduct under the narrow umbrella of absolute immunity. *See Buckley*, 509 U.S. at 276. It may well be that, at the summary judgment stage, Defendant Ater can muster a successful immunity defense. As this Court must accept all well-pled factual allegations by Plaintiffs as true, the complaint adequately alleges that Ater was acting outside the scope of the prosecutorial function when working with SCOJFS to investigate allegations against Plaintiffs and to make decisions as to L.S. *See Watkins*, 986 F.3d at 661 (explaining that a prosecutor is performing investigative functions when giving legal advice prior to the existence of probable cause, including on investigative techniques, prior to the initiation of judicial proceedings). Defendant Ater is thus not entitled to absolute immunity for any investigatory conduct prior to the filing of the *ex parte* removal order.

Defendant Ater's claim to absolute immunity from Plaintiffs' First Amendment retaliation claim is a closer call. Where a retaliation claim against a prosecutor is based on out-of-court acts, a prosecutor may not be shielded by absolute immunity. The Sixth Circuit instructs that the motives of a prosecutor in initiating a prosecution will be irrelevant for determining her entitlement to immunity. *See Eldridge v. Gibson*, 332 F.3d 1019, 1021 (6th Cir. 2003). In *Watkins*, the Sixth Circuit found that threats, promises of immunity, participation in interrogation, and general intimidation and coercion of an individual prior to the existence of probable cause will not be shielded by absolute immunity. 986 F.3d at 662 (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1001–02 (6th Cir. 1999)). Additionally, retaliatory conduct after a trial is completed is considered more akin to administrative or investigative acts not shielded by absolute immunity. *Spurlock v. Thompson*, 330 F.3d 791, 799–800 (6th Cir. 2003). Under *Spurlock*, the key to prosecutorial immunity is advocacy—as in, how closely related the challenged activity is to the prosecutor's "role as an advocate intimately associated the judicial phase of the criminal process." 330 F.3d at 798.

Accepting all well-pled allegations of Plaintiffs' as true, some of Ms. Ater's conduct will be shielded by absolute immunity, but not all of it. Any of Ater's in-court statements were made in her role as a legal advocate and she is entitled to absolute immunity for those actions. Likewise, this Court cannot inquire into the motives of Ms. Ater in initiating cases against the Scharbroughs in determining whether she is entitled to absolute immunity. When Ms. Ater initiates a dependency or similar proceeding, she clearly acts within her role as a legal advocate. Out-of-court statements to the Scharbroughs, however, including threats and harassment, are not clearly part and parcel of her role as a legal advocate. Accordingly, Ms. Ater is not entitled to absolute immunity for any out-of-court behavior toward Plaintiffs that gave rise to their retaliation claims.

Defendant Ater has not carried her burden of showing that absolute immunity is necessary at this stage. Accordingly, Defendant Ater's motion to dismiss **COUNTS V, VII, and IX** is **DENIED**.

### ii.        State Law Claims

Defendant Ater also invokes common law absolute immunity as a defense to Plaintiffs' state law claims against her. Ohio also employs the functional approach to evaluating claims of absolute immunity, like that employed by the Sixth Circuit. *See Willitzer v. McCloud*, 453 N.E.2d 693, 596 (Ohio 1983). Ms. Ater claims absolute immunity against the following state claims: interference with parental interest, invasion of privacy, intentional infliction of emotional distress, loss of consortium, state criminal acts—including dereliction of duty, interference with civil rights, and interference with custody—and conspiracy. As discussed previously, the Plaintiffs have made allegations that Ms. Ater was intimately involved in child services investigations prior to the initiation of any court proceedings. She also allegedly made out-of-court threats to Cyndi about removing L.S. from her custody and using the legal process to harass her. Ms. Ater argues that all actions were performed in her role as a legal advocate, but this Court has already found that some of these alleged actions fell outside her role as a legal advocate. Ms. Ater has not clearly delineated how she was acting as a legal advocate with regard to those non-advocacy allegations and claims blanket immunity to all state law claims. This Court's grant of absolute immunity is one to be extended sparingly and it remains the Defendant's burden to establish an entitlement to such immunity. As such, this Court **DENIES** Defendant Ater's motion to dismiss **COUNTS XII, XIII, XIV, XV, XVI, XVII,** and **XVIII**.

## 2. Qualified Immunity is Premature

The Defendants also invoke qualified immunity as a shield to liability on remaining Counts V, VII, and IX of Plaintiffs' Complaint. The doctrine of qualified immunity provides that "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court may consider qualified immunity on a Rule 12(b)(6) motion, *see Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001), but it is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). An officer's entitlement to qualified immunity is a "threshold question to be resolved at the earliest possible point" in litigation, but "that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433–34 (quoting in part *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)). Ordinarily, dismissal under Rule 12(b)(6) premised on defense of qualified immunity is inappropriate since this defense "requires investigation into facts and evidence not available at the early stage of pleadings." 61A Am. Jur. 2d *Pleading* § 535 (2010).

In support of their claim of qualified immunity, the Defendants argue that Plaintiffs have failed to allege conduct that shows a constitutional violation of a clearly established right. (ECF No. 13 at 12). Even if a constitutional violation of their rights has been properly pled by the Plaintiffs, the Defendants insist that the rights in question would not have been clearly established. (*Id.*). In response, the Plaintiffs argue that the constitutional rights that they seek to vindicate are clearly established by past precedent. (ECF No. 22 at 17). In reply, the Defendants counter that Plaintiffs must do more than "simply identify a clearly established right in the abstract" and then

allege a violation of that right. (ECF No. 25 at 6 (quoting *Reguli v. Guffee*, 371 F. App'x 590, 599 (6th Cir. 2010))).

The Plaintiffs allege that the Defendants violated rights that were clearly established under the First, Fourth, and Fourteenth Amendments. At the motion to dismiss stage, the relevant inquiry is whether the plaintiff has alleged "facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known." *Adams v. Ohio University*, 300 F. Supp. 3d 983, 1002 (S.D. Ohio 2018) (quoting *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 664 (S.D. Ohio 2016)).

### a.      First Amendment Rights

Plaintiff first alleges that the Defendants have violated their rights to protest the misconduct of government employees peacefully and to petition the government for redress of their grievances. (ECF No. 1 at 46). The Plaintiffs allege that these rights were violated when the Defendants retaliated against them for raising concerns to SCOJFS about employees' conduct, both orally and in formal written complaints. (*Id.* ¶¶ 114–15, 123). These concerns included the alleged conflict of interest in SCOJFS investigating the Scharbroughs at all, rather than involving another county as they previously had. The alleged retaliation came in the form of subsequent baseless investigations that harassed the Plaintiffs. The Sixth Circuit has held that petitioning the government is constitutionally protected and that even a citizen's complaint made while in conversation to an official can be treated as protected petitioning. *See Holzemer v. City of Memphis*, 621 F.3d 512, 510 (6th Cir. 2010) (holding that there is "no constitutional distinction between an oral and written petition for redress" and that a reasonable city official would know that retaliation for seeking assistance is unlawful). As such, the Plaintiffs have identified at least one clearly established right under the First Amendment—petitioning the government for

redress—that they allege was violated when the Defendants knowingly conducted unwarranted investigations and used the county's child services machinery as a means to harass them, rather than addressing their concerns.

The Plaintiffs also allege that their constitutionally protected right to familial and intimate association was violated when the Defendants reacted to their decision to marry by subjecting them to further investigations. The Sixth Circuit has acknowledged that the freedom of intimate association is a "privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004). In *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987), the Supreme Court noted that its precedents "have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" 481 U.S. at 545 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 619 – 20 (1984)). The types of intimate relationships shielded by constitutional protection are those that "'attend the creation and sustenance of a family[,]' including marriage, childbirth, raising and educating children." *Strehlke v. Grosse Pointe Pub. Sch. Sys.*, 654 F. App'x 713, 723–24 (6th Cir. 2015) (quoting *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013)). The Plaintiffs have alleged that the Defendants pursued more child service investigations of them because they decided to get married. The right to intimate association, including marriage, has long been clearly established under Supreme Court precedent. At this stage, the Plaintiffs have met their burden under Rule 12.

Whether the facts alleged by Plaintiffs constitute violations of their constitutional rights, however, "are factual issues not appropriate for determination at the pleading stage, much less on the basis of qualified immunity." *Adams*, 300 F. Supp. 3d at 1002 (quoting *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 816 (S.D. Ohio 2014)). As to their First Amendment claims, Plaintiffs do allege sufficient facts to survive the motion to dismiss stage and this Court cannot yet ascertain whether the Defendants are entitled to qualified immunity. Accordingly, Defendants' qualified immunity defense is premature at the motion to dismiss stage.

### b. Fourth Amendment Rights

The Plaintiffs also allege that their constitutional rights under the Fourth Amendment were violated by the Defendants. They contend that their rights to security in the home were well-established and that the Defendants' warrantless entry violated those rights. (ECF No. 22 at 17). The Plaintiffs additionally argue that it is well-established that the warrant requirements and the exigent circumstances exception apply to the removal of children from the home, so the defiance of those requirements violated their rights. (*Id.*). It is clearly established that the Fourth Amendment's requirements apply to the social workers, including that caseworkers must have exigent circumstances or a warrant to search premises or remove a child from the home. *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) ("*Kovacic II*"). Individuals thus have a constitutional right to be free from unreasonable searches and seizures by caseworkers. *See Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 860 (6th Cir. 2012). While the Defendants have produced a certified copy of the *ex parte* court order, the Plaintiffs have alleged that the SCOJFS Defendants sought that order despite a lack of probable cause and then executed it, knowing that it was deficient. (ECF No. 1 ¶ 105). The Sixth Circuit has held that "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes

false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey v. Carroll Cnty., Ky.*, 876 F.2d 1238 (6th Cir. 1989). Whether Plaintiffs' allegations about the method in which Defendants obtained the order amount to a constitutional violation is an issue not appropriate for resolution at this stage, "much less on the basis of qualified immunity." *Adams*, 300 F. Supp. 3d at 1002 (quoting *Thompson*, 990 F. Supp. 2d at 816). This Court cannot determine whether the Defendants are shielded by qualified immunity at this stage, as the factual issues have not been adequately developed.

### c. Fourteenth Amendment Rights

The Plaintiffs also contend that their procedural and substantive due process rights under the Fourteenth Amendment were violated by Defendants. First, they allege that their substantive rights to family integrity and security in their residence were compromised by both the removal of L.S. without any exigent circumstances and the continued investigations of the family without any new information justifying such investigations. (ECF No. 1 ¶ 263). Second, they allege that their procedural due process rights were violated because they were not given notice and an opportunity to be heard before L.S. was removed from their home. (*Id.* ¶ 105). The Defendants seek to raise the defense of qualified immunity against the Plaintiffs' procedural and substantive due process claims, asserting that Plaintiffs cannot show the existence of clearly established rights.

The core of due process is protection against arbitrary government action, including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). The Sixth Circuit has held that "[i]t is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000); *see also Smith v. Williams-Ash*, 520 F.3d

596, 599 (6th Cir. 2008) (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)) ("[U]nder the [Fourteenth Amendment], the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law."). The Sixth Circuit has contrasted the differences between procedural and substantive due process claims as follows: "While procedural due process principles protect persons from deficient procedures . . . substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." *Bartell*, 215 F.3d at 557–58 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976) and *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). This Court will turn to each of the Plaintiffs' Fourteenth Amendment claims in turn and determine whether their rights were clearly established.

The Sixth Circuit characterized the right to family integrity and association as a "paradigmatic example of a substantive due process guarantee." *Schulkers v. Kammer*, 955 F.3d 510, 540 (6th Cir. 2020). In reaching this conclusion in *Schulkers*, the Sixth Circuit relied on prior cases from the Supreme Court, including *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974), and *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981). In *LaFleur*, the Court opined that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." 414 U.S. at 639. The Court later declared in *Lassiter* that it was "plain beyond the need for multiple citation" that a parent's "desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" 452 U.S. at 27 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). When plaintiffs have alleged that the government lacked a justifiable reason to remove the child at the

time of interference, the Sixth Circuit has found that the government has no countervailing interest in preventing child abuse. *Schulkers*, 955 F.3d at 540–41. Here, the Plaintiffs assert that the Defendants suddenly sought removal of L.S. from the home without any new information and without either visiting their home or speaking with them to evaluate L.S.'s safety. The Defendants had fair notice that the Scharbroughs had a substantive due process right to their family integrity, which could not be compromised absent a compelling government interest. At this stage, the Plaintiffs have met their burden in pleading that the Defendants did not have such a compelling government interest to interfere with their clearly established rights.

Likewise, it is clearly established that the parent-child relationship gives rise to a liberty interest that a parent may not be deprived of without due process of law. The Sixth Circuit has acknowledged that it is "clearly established" that "both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child" derive from the Constitution. *Bartell*, 215 F.3d at 557; *see also Smith*, 520 F.3d at 599 (quoting *Kottmyer*, 436 F.3d at 689)) ("[U]nder the [Fourteenth Amendment], the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law."). In *Schulkers*, the Sixth Circuit noted that its previous decisions, including *Smith*, had "reiterate[d] the well-established rule that a state must afford a parent fair process before interfering with a parent's fundamental right to family integrity and the companionship of his or her children." 955 F.3d at 543 (citing *Smith*, 520 F.3d at 599, and *Bartell*, 215 F.3d at 557). The *Schulkers* court found the only exception to that well-established rule is "when a parent voluntarily consents to the terms of a safety plan without duress." *Id*.

Here, the Plaintiffs challenge the removal of L.S. from their home without notice and a pre-deprivation opportunity to be heard, and in the absence of exigent or compelling

circumstances. While Plaintiffs style their Fourteenth Amendment claims as a challenge to a warrantless entry to their home and unlawful seizure of their minor child, the substance of their allegations takes aim at the information upon which L.S. was removed, a lack of notice, and the fact that they only learned of the government's allegations against them and given any opportunity to be heard after the deprivation had occurred. The Plaintiffs are seeking vindication of their clearly established rights to constitutionally adequate procedures before the state interferes with their parent-child relationships. This is sufficient at the motion to dismiss stage. Once again, whether the facts alleged by Plaintiffs constitute violations of their clearly established rights is not appropriate for resolution at this stage, "much less on the basis of qualified immunity." *Adams*, 300 F. Supp. 3d at 1002 (quoting *Thompson*, 990 F. Supp. 2d at 816). This Court cannot determine whether the Defendants are shielded by qualified immunity at this stage, as the factual issues have not been adequately developed. As was the case with their claim of qualified immunity as to Plaintiffs' First Amendment claims, the claim of qualified immunity against the Fourteenth Amendment claims is also premature.

### 3. Statutory Immunity is Premature

Finally, the Defendants also make claims to statutory immunity under Ohio law as to the state tort claims against them. The Municipal Defendants, SCOJFS and RSCO, claim statutory immunity against Plaintiffs state law claims under R.C. § 2744.02(A)(1), which extends immunity to political subdivisions under certain conditions. (ECF No. 13 at 13). The Municipal Defendants argue that the Plaintiffs have not pled any facts to suggest that any of the five exceptions to § 2744.02(A)(1) apply and so they are entitled to immunity. (*Id.*). The individual SCOJFS and RSCO Defendants likewise claim immunity under R.C. § 2744.03(A)(6), which provides immunity to employees of political subdivisions unless an exception applies. (*Id.* at 14). The

Defendants again claim entitlement to immunity because the Plaintiffs have not pled any facts suggesting one of the exceptions applies here. (*Id.*). In response, the Plaintiffs argue that they have in fact pled sufficient facts to suggest that the Defendants were acting beyond the scope of their duties and responsibilities and that they were performed with the requisite malicious purpose, bad faith, or recklessness for the exceptions to statutory immunity to apply. (ECF No. 22 at 18–19).

The Defendants are correct in their assertion that the availability of immunity is properly determined by a court prior to trial. *See Carpenter v. Scherer-Mountain Ins. Agency*, 733 N.E.2d 1196, 1206 (Ohio Ct. App. 1999) (citing *Conley v. Shearer*, 595 N.E.2d 862, 869 (Ohio 1992)). The Supreme Court of Ohio has also instructed that this purely legal issue should be determined "preferably on a motion for summary judgment." *Conley*, 595 N.E.2d at 869 (quoting *Roe v. Hamilton Cnty. Dep't of Hum. Serv.*, 560 N.E.2d 238, 243 (Ohio Ct. App. 1988)). Ohio courts frequently find that immunity defenses present issues "not normally amenable to resolution" at the motion to dismiss stage and emphasize the preferability of resolving these issues at the summary judgment stage. *See, e.g.*, *Roe v. Franklin County*, 673 N.E.2d 172, 181 (Ohio Ct. App. 1996) (finding that affirmative defense of governmental immunity "presents issues not normally amenable to resolution on a Civ.R. 12(b)(6) motion to dismiss"); *Cole v. John G. Johnson & Sons*, No. 68174, 1995 WL 558897, at *3 (Ohio Ct. App. Sept. 21, 1995) (noting necessity of developing factual record before determining whether immunity is appropriate); *Roe v. Hamilton County*, 560 N.E.2d at 243 (same).

Ohio courts will only grant a motion to dismiss premised on an affirmative defense when it is "apparent from the face of the complaint that the defense is available." *Molnar v. City of Green*, 140 N.E.3d 1208, 1213 (Ohio Ct. App. 2019) (quoting *OBLH, LLC v. O'Brien*, No. 2013-T-0111, 2015 WL 1443226, at ¶ 20 (Ohio Ct. App. 2015)). Affirmative defenses typically require

reference to materials outside the fact of the complaint, making it inappropriate to resolve such defenses prior to summary judgment. *See id.* Importantly, the Defendants do not argue that it is apparent from the face of Plaintiffs' complaint that the defense of statutory immunity is available. Ohio precedent makes clear that a plaintiff is under no obligation "to prove his case in his initial pleadings," nor must he "affirmatively dispose of the immunity question altogether at the pleading stage." *Id.* (quoting *Chunyo v. Gauntner*, No. 28346, 2017 WL 2802216, at ¶ 10 (Ohio Ct. App. June 28, 2017)).

A plaintiff need not demonstrate an exception to immunity at the pleading stage, as it "would be tantamount to requiring [a] plaintiff to overcome a motion for summary judgment at the pleading stage." *Scott v. Columbus Dept. of Pub. Utils.*, 949 N.E.2d 552, 554 (Ohio Ct. App. 2011). This, however, is the basis of the Defendants' arguments for statutory immunity: that the Plaintiffs have not affirmatively pled or established any exception to statutory immunity, so the Defendants are entitled to immunity at this stage. (ECF No. 13 at 14). The Plaintiffs are not required to meet some heightened pleading standard and "anticipate a political subdivision's defenses and plead specific facts to counteract a possible affirmative defense of sovereign immunity" to survive a motion to dismiss. *Molnar*, 140 N.E.3d at 1213. The same is true for the individual employees' claims of statutory immunity—Plaintiffs were under not obligation to "rebut a presumption of immunity" when crafting their complaint. *Id.*

The Defendants have not argued that it is apparent from the face of the pleadings that there exists no set of facts under which the Scharbroughs could succeed in countering the defense of statutory immunity. Instead, they erroneously attempt to place the burden on the Plaintiffs to overcome statutory immunity in drafting their initial pleadings. The Defendants' claims of statutory immunity are more amenable to resolution at the summary judgment stage and nothing

in this Opinion should be construed as denying them the opportunity to raise such arguments again at the appropriate stage of litigation. Accordingly, the Defendants' motion to dismiss Plaintiffs' state law claims on the grounds of statutory immunity is premature at this stage of the litigation.

## C.     Failure to State a Claim

The Defendants also seek to dismiss several counts of Plaintiffs' complaint on the grounds that the Plaintiffs have failed to state a claim upon which relief may be granted. A complaint brought by *pro se* Plaintiffs is to be liberally construed, but still must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) for failure to state a claim "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). A court contemplating the motion to dismiss must construe the complaint in the light most favorable to the plaintiff, *see Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), but need not accept as true any mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) requires that the complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). With the requisite legal standard in mind, this Court will turn to each of the claims which Defendants argue must be dismissed under Rule 12(b)(6).

### 1.     Plaintiffs have Failed to State a § 1985 Claim

Section 1985 provides a cause of action against those who conspire to interfere with an individual's civil rights. In their Complaint, the Plaintiffs bring their constitutional claims not only under 42 U.S.C. § 1983 but also 42 U.S.C. § 1985 against the individual defendants employed by SCOJFS and RSCO. The Defendants seek to dismiss any civil conspiracy claims under Section

1985 because the Plaintiffs have failed to identify which provision of § 1985 they are utilizing. They further argue that the Plaintiffs cannot state a claim under any of § 1985's provisions. As the Plaintiffs are proceeding *pro se*, this Court will consider whether they have pled a claim under any subsection of 42 U.S.C. § 1985.

Section 1985 prohibits three types of conspiracies. Subsection (1) of § 1985 relates to a conspiracy to keep a person from accepting or holding an office or preventing him from discharging his duties. Subsection (2) deals with a conspiracy to obstruct justice with the intent to deny equal protection of the law. Subsection (3) is directed to conspiracies to deprive persons or classes of persons of federally protected rights based on some protected class such as race, gender, or religion. *See, e.g.*, *Crosky v. Ohio Dep't of Rehab. & Corr.*, No. 2:09-cv-400, 2012 WL 748408, at *11 (S.D. Ohio Mar. 8, 2012). The Plaintiffs do not identify which prong of § 1985 they are invoking, but rather append it to each federal claim without any substantive allegations of conspiracy. The only allegations that Plaintiffs assert as to any conspiracy is in relation to their claims for state torts. The Plaintiffs allege that the Defendants conspired to deprive Plaintiffs of their constitutional and statutory rights in violation of Ohio law. (ECF No. ¶ 289). They also allege that the defendants conspired with one another in the commission of criminal acts of dereliction of duty, interfering with civil rights, interference with custody, and kidnapping in violation of Ohio law. (*Id.* ¶ 292). The Plaintiffs also allege that the SCOJFS Defendants and Ms. Ater "conspired to recklessly fail to perform duties imposed by law," "conspired to recklessly commit acts forbidden by law," "conspired to interfere with Plaintiffs' constitutional and statutory rights," "conspired to interfere with the Plaintiffs' custody" of L.S., and conspired to kidnap L.S. (*Id.* ¶ 297). This Court will nevertheless assess whether Plaintiffs have stated a colorable claim under either 42 U.S.C. § 1985(2) or 42 U.S.C. § 1985(3)

Section 1985(2) provides for a private cause of action against individuals who acts, by "force, intimidation, or threat," to obstruct justice or intimidate a party or witness to testify truthfully "in any court of the United States." *See Easterling v. Rice*, No. 3:15-CV-257, 2015 WL 4917008, at *3 (S.D. Ohio Aug. 18, 2015). The Plaintiffs make allegations that two Defendants, Perry and Ater, intimidated, threatened, and coerced Cyndi into forfeiting the Plaintiffs' rights to a trial and to stipulate to a dependency. What is missing, however, from the Plaintiffs' allegations is any charge that Perry and Ater conspired to engage in this course of action together. Section 1985(2) clearly requires two or more co-conspirators for a civil conspiracy for a cause of action to lie. Accordingly, the Plaintiffs cannot state a claim under 42 U.S.C. § 1985(3).

To bring a civil conspiracy claim under 42 U.S.C. § 1985(3), the Plaintiffs must show "'that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). Additionally, the civil conspiracy claim must be based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Smith v. Martin*, 542 F.2d 688, 690 (6th Cir. 1976) (explaining that a § 1985(3) claim "must be founded on a class-based invidious discrimination."). The Sixth Circuit has further expanded upon who may successfully bring a 1985(3) claim: "(1) classes who receive heightened protection under the Equal Protection Clause; and (2) those individuals who join together as a class for the purpose of asserting certain fundamental rights." *Warner v. Greenebaum, Doll & McDonald*, 104 F. App'x 493, 498 (6th Cir. 2004). The Plaintiffs do not allege that any alleged conspiracy was motivated

by a racial or other class-based, invidiously discriminatory animus. As such, they have failed to state a claim under 42 U.S.C. § 1985(3).

### 2. Plaintiffs have Failed to State an Equal Protection Claim

The Fourteenth Amendment also confers a guarantee of equal protection of the laws. The Defendants seek to dismiss Count XI of Plaintiffs' complaint because they cannot state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 15 at 16). The Defendants argue that the Plaintiffs cannot allege a violation of the Equal Protection Clause because they have not alleged membership in a protected class, nor can they show a discriminatory purpose. (*Id.*). The Defendants further argue that the Plaintiffs have not articulated any way in which the Defendants treated Plaintiffs any differently than other similarly situated without any rational basis. (*Id.* at 17). In response, the Plaintiffs argue that they have pled sufficient facts to support their equal protection claim against the Defendants. They mount two arguments against the Defendants' motion to dismiss. First, they assert that parents whose custody of their children is challenged constitute a "unique class of individuals, whose fundamental right to their children cannot be deprived without . . . equal protection" of the law. (ECF No. 22 at 20). Second, they argue that the removal of L.S. without notice or a pre-deprivation hearing deprived them of equal protection. (*Id.*).

The Equal Protection Clause "safeguards against the disparate treatment of similarly situated individuals as a result of government action that 'either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 649 (6th Cir. 2015) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 364, 379 (6th Cir. 2011)). An equal protection claim can also be premised on a "class-of-one" theory under which plaintiffs must allege that, due to animus, they were treated differently than similarly

situated individuals. *See Benalcazar v. Genoa Twp.*, No. 2:18-cv-01805, 2020 WL 4933797, at *4 (S.D. Ohio Aug. 24, 2020) (citing *Paterek*, 801 F.3d at 649–50). To withstand a motion to dismiss, the Plaintiffs must allege either "(1) disparate treatment from similarly situated individuals with no rational basis for the difference, or (2) that the challenged conduct was motivated by animus or ill-will." *Id.* (citing *Paterek*, 801 F.3d at 650). The Plaintiffs appear to be proceeding under the first of these options, as they have not raised any allegations of animus or ill-will in their Complaint.

As previously discussed, the right to intimate association and familial integrity are established, fundamental rights. According to the Sixth Circuit, the "threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification" at issue. *Napolitano*, 648 F.3d at 379 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). The Plaintiffs allege that the Defendants deprived them of these fundamental rights without providing adequate pre-deprivation procedures "that are extended to all other parents whose custody of their children" is at issue. (ECF No. 1 ¶ 270). They also claim their rights were violated by the removal of L.S. without notice and a pre-deprivation hearing. Taken together, these allegations by Plaintiffs suggest they are arguing that all other parents whose custody is potentially compromised by the Defendants receive notice and a pre-deprivation hearing before a removal is sought.

The Amended Complaint fails to make a plausible allegation that similarly situated parents in Ross County have not been subject to the same treatment by Defendants. To do so, Plaintiffs would have to assert that the Defendants have never sought and executed *ex parte* removal orders of other children. Yet that assertion would directly contradict the Plaintiffs' allegation that SCOJFS engaged in a custom, practice, and/or policy of working with RSCO sheriff deputies to

execute *ex parte* removal of Ross County residents' minor children. (*Id.* ¶ 210). As such, the Plaintiffs have failed to put forth any plausible factual allegations that they have been subject to disparate treatment as compared to other similarly situated parents. The Defendants' motion to dismiss **Count XI** of Plaintiffs' Complaint is therefore **GRANTED**.

### 3. Supervisory Liability Claims

A supervisor may be held liable for constitutional violations committed by their subordinates when they implicitly authorize, approve, or knowingly acquiesce in the unconstitutional conduct. *See Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020). Several of the SCOJFS Defendants seek to dismiss the supervisory liability claims asserted against them in Counts II, III, and IV of Plaintiffs' Complaint. The Defendants first argue that there are no underlying unconstitutional actions to which supervisory liability may attach. (ECF No. 15 at 18–19). The Defendants also argue that the Plaintiffs have failed to state supervisory liability claims against them because the Plaintiffs have pled failures to act by those in supervisory positions, when the Plaintiffs must instead show these Defendants condoned or encouraged unconstitutional behavior by subordinate employees. (*Id.*). As previously discussed, the Plaintiffs identified clearly established rights under the First and Fourteenth Amendments and have pled allegations related to violations of those rights that are sufficient to withstand a motion to dismiss. This Court will thus consider whether the supervisory liability allegations are related to Plaintiffs' surviving claims and, if so, whether the Plaintiffs have carried their burden at this stage of the litigation.

To state a supervisory liability claim, a plaintiff must allege that a supervisory official "encouraged the specific incident of misconduct or in some other way directly participated in it." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (citing *Cardinal v. Metrish*, 564 F.3d 794,

802–03 (6th Cir. 2009)). This means that plaintiffs must allege facts that indicate that the SCOJFS supervisors "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* Mere allegations of *respondeat superior* supervisory liability will not support a § 1983 claim. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). The Sixth Circuit requires a showing of some "active unconstitutional behavior" on the part of the supervisor for supervisory liability to attach. *Id.* (citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). "Active" behavior does not require a supervisor to be physically present or involved at the time of the constitutional violation, however. *See id.* A plaintiff will satisfy the pleading standard for supervisory liability by alleging that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [subordinates]." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

### a.    Defendant Walker

Defendant Walker argues that Plaintiffs cannot succeed on their supervisory liability claim against him because there is no underlying unconstitutional behavior and, if there was an alleged violation, the Plaintiffs have not alleged that Walker himself condoned or encouraged that unconstitutional behavior. (ECF No. 15 at 18). Defendant Walker is the Director at SCOJFS, and according to Plaintiffs, "was the day-to-day policymaker at SCOJFS." (ECF No. 1 ¶ 9). The Plaintiffs allege that they submitted multiple formal complaints to Defendant Walker about the constitutional deficiencies in their investigation and case, as well as the conflicts of interest in SCOJFS carrying out any investigation at all. (*Id.* ¶¶ 87–88). The Plaintiffs contend that Walker dismissed their formal complaints, claiming they were meritless or unfounded. (*Id.*). The Plaintiffs also allege that Walker facilitated or otherwise participated in the constitutional and statutory rights alleged by Plaintiffs. (*Id.* ¶¶ 222, 226).

The Plaintiffs also make several allegations against the "SCOJFS Defendants" collectively, which they have defined to include Defendant Walker. (*Id.* ¶ 22). Specifically, the Plaintiffs argue that the SCOJFS Defendants, including Walker, conducted weekly meetings "to discuss and make case decisions on all children service cases handled by SCOJFS in Ross County." (*Id.* ¶ 58). The Plaintiffs also allege that the collective decision to pursue an *ex parte* removal order for L.S. occurred during one of these weekly meetings and was a decision that went "through everyone." (*Id.* ¶ 104). The Plaintiffs have asserted that the Defendants' decisions coming out of these meetings, including to seek *ex parte* removal of L.S. without sufficient investigation and to later open unwarranted investigations against them, violated their Fourteenth Amendment rights. Plaintiffs' allegations that Defendant Walker was present at the meetings wherein these key decisions were taking place, without proper investigation of the Scharbroughs or L.S.'s safety, are sufficient to withstand the motion to dismiss. They also allege he was present at meetings after which new cases were opened against the Scharbroughs for retaliatory reasons. Certainly, the presence of the SCOJFS Director at case meetings where allegedly unconstitutional decisions were being made sufficiently alleges that the Director condoned or acquiesced in this behavior. As such, Defendant Walker's motion to dismiss **Count II** against him is **DENIED**.

### b.    Defendant Flick

Defendant Flick raises similar arguments to those raised by Defendant Walker, which are similarly unavailing at this stage. Defendant Flick is SCOJFS's Protective Services Manager. (*Id.* ¶ 10).  The Plaintiffs allege that they raised their concerns about the conflict of interest with SCOJFS investigating one of their recent employees "multiple times," but that Defendant Flick dismissed those concerns. (*Id.* ¶¶ 114–15). A previous investigation into the Plaintiffs had been investigated by SCOJFS in Vinton County, rather than Ross County. (*Id.* ¶ 37). Defendant Flick is

also included in the collective of "SCOJFS Defendants," against whom the Plaintiffs raise several relevant allegations. (*Id.* ¶ 22). As discussed, this includes the allegation that Flick was a part of the group that made a collective decision to seek *ex parte* removal of L.S., despite a lack of sufficient information, and the allegation that Flick regularly participated in weekly meetings wherein case decisions were made. (*Id.* ¶¶ 58, 104). According to Plaintiffs, her participation at these meetings where allegedly unconstitutional decisions were being made by the SCOJFS employees constituted facilitation of or participation in the unlawful conduct. (*Id.* ¶¶ 230, 235). This includes decisions that denied the Plaintiffs their due process rights and to use new investigations to retaliate against the Plaintiffs for raising concerns. These allegations are sufficient to withstand a motion to dismiss. Accordingly, Defendant Flick's motion to dismiss **Count III** against her is **DENIED**.

### c.    Defendants Evans, Lindsey, Sparks, Reeves, and Mills

The Plaintiffs also assert claims of supervisory liability against Defendants Evans, Lindsey, Sparks, Reeves, and Mills, all of whom argue that the Plaintiffs have not met their pleading burden to maintain these claims past the motion to dismiss stage. Defendants Evans, Sparks, and Reeves argue that the Plaintiffs have not pled any affirmative acts to support their claim and, as such, alleging only a failure to act is insufficient to maintain supervisory liability claims against them. (ECF No. 15 at 19). In turn, Defendants Lindsey and Mills argue that there is no unconstitutional behavior by a subordinate that they can be held liable for as supervisors. (*Id.*).

### i.    Evans

According to Plaintiffs, Defendant Evans supervised Defendant Snow, who was Plaintiffs' initial caseworker from SCOJFS Ross County in 2018. (ECF No. 1 ¶¶ 54–55). Defendant Evans was employed as a Protective Services Supervisor and was Cyndi's immediate supervisor when

she was employed at SCOJFS. (*Id.* ¶¶ 11, 56). The Plaintiffs allege that Evans was directly responsible for deciding that SCOJFS in Ross County would handle the case, despite a conflict of interest. (*Id.*). The Plaintiffs make several allegations that Defendant Snow did not thoroughly investigative other issues they raised to her. (*Id.* ¶¶ 59–60). They also allege that Defendants Snow and Evans regularly conferred on their case in 2018 and jointly made case decisions. (*Id.* ¶ 71). This includes the decision by Snow to knowingly allow L.S. to remain in the home, despite the removal of the other children in the home *ex parte*. (*Id.* ¶ 67). Important to the Plaintiffs' due process and retaliation claims, the Plaintiffs contend that nothing new transpired between the removal of the other children and the Defendants' eventual decision to remove L.S. months later. While these allegations provide important overall context, they pertain primarily to the investigation concerning the other children which is not at issue in this suit. (*Id.* ¶ 76). As such, the Plaintiffs have not adequately pled a claim of supervisory liability against Defendant Evans. Defendant Evans's motion to dismiss **Count IV** against her is **GRANTED**.

### ii.    Sparks

As described in the Plaintiffs' complaint, Defendant Sparks supervised Defendant Schreck, who was assigned to L.S.'s case in April 2019. (*Id.* ¶¶ 135–36). Cyndi raised several concerns about exculpatory evidence and conflicts of interest to both Schreck and Sparks in May 2019, but her concerns were again dismissed. (*Id.* ¶ 138). Cyndi alleges that Sparks, in conjunction with Schreck, advised her to file a motion to return pertaining to L.S. and informed her that they would support her motion. (*Id.* ¶ 139). Defendant Sparks, in conjunction with her subordinate, dismissed Cyndi's concerns about conflicts of interest in the investigation and allegedly declined to pursue evidence that was relevant to L.S.'s case. These allegations are relevant to the Plaintiffs' due process claims and allege that Defendant Sparks was actively involved in and otherwise sanctioned

the purportedly insufficient and biased investigatory tactics in Plaintiffs' case. At this stage, the Plaintiffs have sufficiently pled a claim of supervisory liability and Defendant Sparks's motion to dismiss **Count IV** against her is **DENIED**.

### iii. Reeves

The Plaintiffs allege that Defendant Reeves also supervised Defendant Snow, who was one of the case workers assigned to L.S.'s case in 2019, after L.S. had been returned to Cyndi's custody. As discussed previously, the Plaintiffs allege that they sent L.S. to live outside of the jurisdiction of SCOJFS, but that the agency nevertheless continued to open baseless investigations into them. In November 2019, Defendants Snow and Radcliff came to the Plaintiffs' shared residence because another child services case had been opened against Cyndi. (*Id.* ¶ 153). Once these employees left, Cyndi called Defendant Reeves and asked why SCOJFS was not recusing itself from the case because of the conflict of interest. (*Id.* ¶ 156). Defendant Reeves informed Cyndi that she would speak to Defendant Flick about the matter. Cyndi called several Defendants, including Reeves, and requested that SCOJFS stop "harassing" her and her family. (*Id.* ¶ 159). The Plaintiffs have alleged that later child services investigations pertaining to L.S. were part of a course of retaliation against them and were also founded on allegations that the Defendant knew to be baseless. Cyndi expressed concern about the conflicts of interest and the harassing nature of the investigation to Defendant Reeves, who Plaintiffs argue acquiesced or otherwise condoned the unlawful conduct by her subordinate. The Sixth Circuit has found the pleading standard for supervisory liability to be satisfied by a plaintiff who alleges that a defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending [subordinates]." *Shehee*, 199 F.3d at 300. The allegations by Plaintiffs do not sufficiently link Defendant Reeves to Defendant Snow's misconduct, such that Reeves plausibly authorized or

knowingly acquiesced in it. Plaintiffs have not sufficiently pled a claim of supervisory liability against Defendant Reeves and so her motion to dismiss **Count IV** is **GRANTED**.

### iv.    Lindsey

Defendant Lindsey was also employed as a Protective Services Supervisor at SCOJFS while Plaintiffs were under investigation. Defendant Lindsey supervised the Scharbroughs' ongoing caseworker during 2018, Defendant Radcliff. (*Id.* ¶¶ 78, 79). Defendant Lindsey, as well as her subordinate Defendant Radcliff, were present for the *ex parte* removal of L.S. in September 2018. (*Id.* ¶¶ 99–100). Defendant Lindsey was present when Defendant Radcliff denied Cyndi's offers to submit to a voluntary safety plan for L.S. or have her placed with friends or relatives. (*Id.* ¶ 100). She was also present when Radcliff refused to consider non-foster care placement options for L.S. and insisted upon taking L.S. to a foster home. (*Id.*). Defendant Lindsey was allegedly in the group of SCOJFS Defendants who made the collective decision to seek removal of L.S.; the group also included her subordinate, Defendant Radcliff. (*Id.* ¶¶ 104–05). This group made this decision despite never visiting Plaintiffs' home, notifying Plaintiffs of concerns, or obtaining credible information or knowledge about L.S.'s living circumstances. (*Id.* ¶ 105). Defendant Lindsey also supervised Defendants Perry and Schreck. Defendant Perry was assigned to the Plaintiffs' case in November 2018. (*Id.* ¶ 122). The Plaintiffs allege that Defendant Perry threatened and coerced them into stipulating to a dependency after offering favorable arrangements concerning L.S. The Plaintiffs also allege that they called Defendant Lindsey in 2019, when Defendants Schreck and Radcliff were again assigned to the case, and asked SCOJFS to stop harassing them via the investigations when L.S. was not in the jurisdiction. (*Id.* ¶ 159).

The Plaintiffs do not plead that Defendant Lindsey knew of, authorized, or acquiesced in either Perry or Schreck's conduct toward the Plaintiffs. The Plaintiffs do, however, make sufficient

allegations that Lindsey was actively involved in Defendant Radcliff's unlawful conduct toward them, such that she could be considered a participant in it or, at the very least, that she had authorized or acquiesced in it. Accordingly, Plaintiffs have stated a claim of supervisory liability against Defendant Lindsey and her motion to dismiss **Count IV** is **DENIED**.

### v. Mills

The Plaintiffs allege that Defendant Mills was present during the *ex parte* removal of L.S. and also participated in investigations into the Plaintiffs in summer 2020, despite the Plaintiffs' continued assertions that L.S. did not reside with Duston and in fact did not live within the purview of SCOJFS for Ross County. (*Id.* ¶¶ 99, 177–78). The Plaintiffs do not, however, make any allegations that Defendant Mills supervised anyone and thus a claim for supervisory liability has not been adequately pled against her. Defendant Mills's motion to dismiss **Count IV** against her is therefore **GRANTED**.

### 4. The Plaintiffs' *Monell* Claim May Proceed

A municipality may also be held liable under 42 U.S.C. § 1983 for constitutional violations. In order to pursue a § 1983 claim against a municipality, a plaintiff must allege an unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or a "constitutional deprivation[] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). Like supervisory liability, a municipality may not be held liable for the acts of its employees under a theory of *respondeat superior*. *Id.* at 691. The Plaintiffs have brought a *Monell* claim against SCOJFS and RSCO, alleging that these entities had a custom, policy, pattern, or practice of tolerating unconstitutional behavior by its employees, including

retaliation and improper removal of children. (ECF No. 1 at 37–40). SCOJFS and RSCO move for dismissal of the claims against them because the complaint does not identify a prior incident or pattern. (ECF No. 15 at 20). They also argue that the Plaintiffs cannot prove the required elements of a "failure to supervise" theory of liability. (ECF No. 15 at 21–22).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must adequately plead "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia County*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)). Municipal liability will lie if the plaintiff has pled that a government's custom is "so permanent and well-settled as to constitute a custom or usage with the force of law" or when the government's official policy is the "moving force" of the constitutional violation. *See Mathis v. Ohio Rehab. & Corr.*, No. 2:10-cv-574, 2010 WL 39822345, at *2 (S.D. Ohio Oct. 7, 2010) (quoting *Davenport v. Simmons*, 192 F. Supp. 2d 812, 824 (W.D. Tenn. 2001) and *Monell*, 436 U.S. at 694).

The Plaintiffs have alleged that SCOJFS acquiesced in, approved of, or otherwise maintained a custom, practice, or policy of deliberate indifference to the unconstitutional behaviors by its staff in assessing, investigating, and intervening in child services cases. (ECF No. 1 ¶¶ 188–89). They allege that SCOJFS was aware of the unconstitutional behavior by its agents, but took no substantive action to reprimand, discipline, or other correct these behaviors. (*Id.* ¶¶ 190–92). The Plaintiffs also argue that SCOJFS maintained a custom or practice of deliberate indifference to retaliation, reliance on known false allegations to pursue action against individuals, and The Plaintiffs also allege a policy of failing to investigate allegations of unconstitutional behavior by its employees. (*Id.* ¶ 208). Finally, they allege a failure by SCOJFS to supervise its employees

adequately in their assessments, investigations, and interventions of child abuse, neglect, and dependency. (*Id.* ¶ 211). As to RSCO, the Plaintiffs allege that the entity also maintained a policy or custom of aiding SCOJFS in entry to homes and removal of children without exigent circumstances or other adequate justification, and that RSCO was deliberately indifferent to these alleged constitutional violations. (*Id.* ¶ 213–17). The Plaintiffs allege that the agents of SCOJFS and RSCO, who engaged in the unconstitutional behavior, were acting in accordance with the customs, policies, and practices of their employers.

The Defendants, however, attempt to hold Plaintiffs to a standard of proving their case this stage, rather than make adequate allegations to survive a motion to dismiss. This demands too much. The Plaintiffs have repeatedly alleged in their complaint that the violations of their constitutional and civil rights resulted from customs, practices, and/or policies of SCOJFS and RSCO. They have also alleged a course of wrongful conduct towards them by SCOJFS and its employees, over the course of several years, coupled with formal complaints. The Plaintiffs also argue that the removal of their other children without proper investigation suffices to show a pattern. (ECF No. 22 at 25). This is sufficient to survive the motion to dismiss as to *Monell* liability. *See, e.g.*, *Lyons v. Jacobs*, No. 2:16-cv-813, 2017 WL 4168369, at *7 (S.D. Ohio Sept. 20, 2017) (finding that where Plaintiffs had alleged that the violations of their constitutional and civil rights were a direct result of the city's "custom, practice and/or policy," a *Monell* claim could proceed).

It is also unclear to the Court whether the Plaintiffs have asserted a distinctive "failure to supervise" claim, as the Defendants argue. The Plaintiffs have styled Count I of their complaint as "Unconstitutional Policies and Customs," arising pursuant to "42 U.S.C. § 1983 (*MONELL*)." A failure to supervise its employees adequately is but one of many alleged customs, practices, and policies that the Plaintiffs allege should give rise to liability here. According to Plaintiffs, they

expressed their concerns about constitutional deficiencies in the investigatory tactics and decisions of SCOJFS employees, both orally and in formal, filed complaints. SCOJFS and its employees deemed those allegations "meritless" and decided to maintain the allegedly deficient policies. When a municipality is on actual or constructive notice that particular omissions in training or supervision leads to a violation of constitutional rights, a decision to retain that program may be deemed deliberately indifferent. *Connick v. Thompson*, 563 U.S. 51 (2011). A so-called "policy of inaction," when a municipality is on notice of constitutional violations, can be considered the "functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Id.* (quoting *Canton*, 489 U.S. at 395). At this stage, the Plaintiffs have sufficiently alleged deliberate indifference by SCOJFS, who was on actual notice that its child services investigations and interventions were constitutionally deficient. Accordingly, Defendants' motion to dismiss **Count I** of the complaint is **DENIED**.

### 5. Plaintiffs' Intentional Infliction of Emotional Distress Claim May Proceed

The Defendants also seek to dismiss several of Plaintiffs' state law claims against them on the grounds that the Plaintiffs have failed to state a claim. This Court will first consider Defendants' motion to dismiss Plaintiffs' claim for intentional infliction of emotion distress. The Defendants argue that the Plaintiffs have not put forth sufficient facts to support the claim that they suffered severe emotional distress and the conduct alleged does not rise to the level of extreme or outrageous. (ECF No. 15 at 22–23). The Plaintiffs respond that the care, custody, and control of their children is one of the most serious rights provided under the Constitution. (ECF No. 22 at 25). They further argue that the unlawful separation from L.S. meets the standard for outrageous conduct and that they can produce records of emotional trauma. (*Id.* at 26–27).

To state a claim for intentional infliction of emotional distress, a plaintiff must prove "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgmt., Inc.*, 410, 644 N.E.2d 286, 289 (Ohio 1994). Conduct will not be considered extreme and outrageous if it amounts to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ettayem v. Ramsey*, No. 17AP-155, 2019 WL 952037, at *5 (Ohio Ct. App. Feb. 26, 2019) (quoting *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) (overruled on other grounds)). The conduct must instead go beyond the bounds of decency and be "utterly intolerable in a civilized community." *See id.* What the Plaintiffs have alleged here—the removal of a child from the home without sufficient investigation and on known false information, as well as the use of the child services system to retaliate against the Plaintiffs for expressing their concerns—is not a mere insult or petty oppression. If taken as true, the alleged conduct is beyond the bounds of decency.

The Defendants also argue that the Plaintiffs have not adequately pled that they suffered an emotional injury from L.S.'s removal. Ohio law instructs that severe emotional distress is shown when there is an emotional injury that is severe and debilitating. *See Mendlovic v. Life Line Screening of Am., Ltd.*, 877 N.E.2d 377, 386 (Ohio Ct. App. 2007). In their complaint, the Plaintiffs state several times that the Defendants' conduct has caused them "severe mental emotional distress" and "severe anxiety." (ECF No. 1 ¶¶ 248, 260, 267). The mere fact that these statements appear in the claims for relief section, rather than the facts section, does not defeat their claim, especially as this Court is to construe the pleadings of *pro se* litigants liberally. Taking Plaintiffs' well-pled allegations as true, this Court finds that the Plaintiffs may sustain a claim for intentional

infliction of emotional distress. Accordingly, the Defendants motion to dismiss **Count XV** is **DENIED.**

### 6. Plaintiffs' Loss of Consortium Claim May Proceed

Ohio courts have long recognized a cause of action for a loss of consortium, wherein a parent loses the companionship of their child can seek to recover damages. *See, e.g.*, *Gallimore v. Children's Hosp. Med. Ctr.*, 617 N.E.2d 1052, 1053–54 (Ohio 1993). The Defendants argue that the Plaintiffs cannot state a claim for loss of consortium because they cannot establish an underlying tort and the Plaintiffs respond that they have put forth facts to sustain several different torts. (ECF No. 15 at 23; ECF No. 22 at 27). This Court has already found that the Plaintiffs have sufficiently pled facts to sustain a claim for intentional infliction of emotional distress, in additional to their federal constitutional claims. The Plaintiffs also raise several other tort claims against the Defendants, including interference with parental interest and criminal acts.

The Defendants also argue that the loss of consortium claim cannot stand without any physical injury to L.S. (ECF No. 15 at 23). The Plaintiffs respond that parents may pursue recovery for losses that result from interference with the parent-child relationship. (ECF No. 22 at 27). Ohio law does recognize a loss of consortium claim "when the child has actually been removed from the parent's company." *Bock v. Hamilton Cnty. Bd. of Park Comm'rs*, 726 N.E.2d 509, 510 (Ohio Ct. App. 1999); *see also Gallimore*, 617 N.E.2d at 1057 (noting that a loss of consortium includes "services, society, companionship, comfort, love and solace"). Given that Ohio allows parents to bring loss of consortium claims for removal of their children, the Plaintiffs have pled sufficient allegations to state a claim because they allege that the Defendants removed L.S. from their company without proper investigation or adequate justification. As a result, the Defendants' motion to dismiss **Count XVI** is **DENIED**.

### 7. Plaintiffs' Civil Conspiracy Claim May Proceed

Like their argument about Plaintiffs' loss of consortium claim, the Defendants also argue that the Plaintiffs cannot state a claim for civil conspiracy because they cannot establish an underlying tort. The Plaintiffs again respond that they have pled a variety of underlying torts and that it cannot be said at this stage, as a matter of law, that there exists "no proof tending to establish a conspiracy." (ECF No. 22 at 27). This Court has already found that they have pled sufficient facts to sustain a claim for intentional infliction of emotional distress. The Plaintiffs also raise several other tort claims against the Defendants, including interference with parental interest and criminal acts, which have not been dismissed by this Court. From the face of the complaint, The Plaintiffs have raised adequate allegations that the Defendants' conspired together to deprive them of custody of L.S., including through the Defendants' weekly meetings. Accordingly, the Defendants' motion to dismiss **Count XVIII** is **DENIED.**

### D. Defendant-Specific Dismissals

Defendants Snow, Perry, Lightle, and Schreck each independently move to dismiss the claims against them. Each argues that the Plaintiffs have not pled sufficient facts to sustain any claim against them. These claims include First Amendment retaliation, Fourteenth Amendment procedural and substantive due process claims, interference with parental interest, intentional infliction of emotional distress, loss of consortium, criminal acts, and civil conspiracy.

### 1. Defendant Snow

Defendant Snow seeks to dismiss the claims against her because many of the factual allegations about her conduct related to the removal of the Plaintiffs' other children, which is not the subject of this lawsuit. Ms. Snow was assigned as the Plaintiffs' initial caseworker in 2018, including the period when the other children were removed from the Plaintiffs' custody. According

to Plaintiffs, Defendant Snow permitted L.S. to remain at home when the other children were removed, despite possessing the same information she did when SCOJFS later sought removal of L.S. (ECF No. 1 ¶ 77). In November 2019, Defendant Snow was allegedly part of the group that initiated another child services investigation against the Plaintiffs, who threatened to take custody of L.S. and to open children services cases on knowingly false allegations. (*Id.* ¶ 153). This conduct occurred shortly after the Plaintiffs were threatened in court for their decision to marry and the Plaintiffs' refusals to cooperate with an investigation, beyond informing the Defendants that L.S. no longer resided within SCOJFS's jurisdiction. (*Id.* ¶¶ 150–51). This conduct also occurred immediately after the SCOJFS Defendants had their weekly case meeting together. Taking Plaintiffs' well-pled allegations as true, Defendant Snow's 2019 conduct can reasonably support the Plaintiffs' claims under the federal Constitution and Ohio law. Defendant Snow's motion to dismiss the claims against her is **DENIED**.

### 2.    Defendant Perry

Defendant Perry also seeks dismissal of Plaintiffs' claims against her, claiming insufficient facts have been pled to support any of the asserted claims. Defendant Perry became the Plaintiffs' caseworker in November 2018, following the removal of L.S. from the Plaintiffs' home and Duston's appeal concerning the sexual abuse disposition. Cyndi relayed to Perry all the relevant evidence that had not been pursued by SCOJFS and again raised the couple's concerns that an adequate investigation was not being conducted. (*Id.* ¶ 123). Defendant Perry dismissed Cyndi's concerns and then improperly pressured Cyndi to forgo a juvenile court trial. (*Id.* ¶ 124). Perry suggested that the Juvenile Court would give SCOJFS whatever SCOJFS sought and that if Cyndi would stipulate to a dependency of the other children, she could have unsupervised visits with L.S. and the ICPC process would be started so that L.S. could live with Cyndi's parents. (*Id.*). A few

months later, Perry was part of a group who offered to drop the sexual abuse allegations if Cyndi would stipulate to a dependency. The Plaintiffs accepted the stipulation, fearing further retaliation and the loss of permanent custody. (*Id.* ¶ 126). Cyndi further alleges that Perry defied the juvenile court's order and refused to give Cyndi weekend visits with L.S. (*Id.* ¶¶ 126–27). Perry never began the ICPC process to place L.S. with Cyndi's parents. Taken together, the Plaintiff's allegations suggest that Perry used L.S. as a bargaining chip to achieve a stipulation to dependency in the other children's cases and made threats to achieve this outcome. She also interfered with the juvenile court's order of weekend visits.   Accepting Plaintiffs' well-pled allegations as true, Defendant Perry's conduct is sufficient to sustain Plaintiffs' claims against her under the federal Constitution and Ohio law. As a result, Defendant Perry's motion to dismiss is **DENIED**.

### 3.     Defendant Lightle

Defendant Lightle also moves to dismiss the Plaintiffs' claims against him, arguing that the Scharbroughs have not put forth sufficient allegations to sustain claims against him. Defendant Lightle became involved with the Plaintiffs in July 2020. Cyndi came to stay at the Plaintiffs' shared apartment because she had been subpoenaed for her husband's trial, but the trial was then continued. The same day Cyndi left the shared apartment, the SCOJFS Defendants had a weekly meeting, after which they initiated another children services case against Cyndi. (*Id.* ¶ 175). Following the meeting, Defendant Lightle came to the shared apartment and left his business card, along with a letter, for Cyndi. The letter instructed Cyndi that he wanted to meet with her a few days later at a set time, and that a failure to attend the appointment could result in court action. (*Id.* ¶ 176). When Cyndi called Mr. Lightle, he informed her that SCOJFS was investigating an allegation that L.S. was living with Duston in violation of the no-contact order. (*Id.* ¶ 177). This allegation was identical to the allegation investigated in November 2019. (*Id.*).

Cyndi again informed Mr. Lightle that L.S. was living outside of SCOJFS's jurisdiction and had not had any contact with her father. (*Id.*). Nonetheless, Mr. Lightle arrived at the Plaintiffs' shared apartment at the set time, where Duston was present. (*Id.* ¶ 178). Duston repeated that L.S. resided outside the county's jurisdiction. (*Id.*). Mr. Lightle and Ms. Mills searched the apartment and found no indication L.S. had ever been present in the apartment. (*Id.* ¶ 179). After this incident, Duston filed another formal complaint with Defendant Walker, to which he has never received a response. (*Id.* ¶ 180). Taken together, the Plaintiffs allege that Defendant Lightle was part of a group that decided to open another investigation into Cyndi without any new evidence that warranted an investigation. If accepted as true, the allegations against Mr. Lightle are adequate to state a claim against him under the First and Fourteenth Amendments and also support the Ohio tort claims against him. Accordingly, Defendant Lightle's motion to dismiss the Plaintiffs' claims against him is **DENIED**.

### 4.    Defendant Schreck

Finally, Defendant Schreck also argues that the claims against her must be dismissed because they are not supported by sufficient factual allegations. Defendant Schreck became involved with the Plaintiffs' case in late April 2019 when she was assigned as their ongoing caseworker. On May 10, 2019, Cyndi again expressed her concerns to Ms. Schreck and Ms. Sparks about the insufficient investigation by SCOJFS, as well as the conflict of interest. (*Id.* ¶ 138). Cyndi also informed them that she had obtained her own apartment and was living apart from Duston to facilitate L.S.'s return to her custody. (*Id.* ¶ 139). Upon hearing that Cyndi was residing in a new apartment, Ms. Schreck and Ms. Sparks agreed to return L.S. to Cyndi's custody and told her they would support her filing a "motion to return" to formalize L.S.'s return to her custody. (*Id.*). With Ms. Schreck's approval, L.S. returned to Cyndi's custody a few weeks later. Ms.

Schreck allowed Cyndi and L.S. to visit Cyndi's family in Virginia. Finally, Ms. Schreck approved of L.S. moving to Virginia in July 2019. (*Id.* ¶ 141). The motion to return was granted ten days later and SCOJFS closed their case on L.S. (*Id.* ¶ 142). Following the Plaintiffs' marriage in September 2019, Ms. Schreck questioned the Plaintiffs about L.S., demanding to know her whereabouts and school enrollment status. (*Id.* ¶ 151). The Plaintiffs responded that L.S. lived outside the jurisdiction of Juvenile Court and SCOJFS. (*Id.*). They also told Ms. Schreck that L.S. had no contact with Duston. (*Id.*). Ms. Schreck also called Cyndi's mother and sought information about L.S. (*Id.* ¶ 157). Ms. Schreck told Cyndi's mother that another case was being initiated against Cyndi. (*Id.*). Taking Plaintiffs' well-pled allegations as true, Ms. Schreck harassed them and opened new investigations against them because they got married, even though she had previously approved the move of L.S. to Virginia—outside SCOJFS's jurisdiction. She pursued that investigation against them, despite knowing that L.S. with no adequate information that L.S. had returned to the jurisdiction. These allegations are sufficient to allow Plaintiffs' constitutional and Ohio law claims against Ms. Schreck to proceed past the motion to dismiss stage. Thus, Ms. Schreck's motion to dismiss is **DENIED**.

## IV.  CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss (ECF No. 13) is **GRANTED IN PART** and **DENIED IN PART**. Counts X and XI are dismissed as to all Defendants. Count IV is dismissed as to Defendants Evans and Reeves. Count VII and Count IX are dismissed as to Defendants Speakman and Sams.

**IT IS SO ORDERED.**

**DATED:  June 7, 2021**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**